**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

COMMUNITY HEALTH CENTER, INC.,   :      LEAD DOCKET NO. 3:01CV146(JBA)
    *Plaintiff*                       :
                                         :      ALL CASES
    v.                                :
                                         :
PATRICIA WILSON-COKER,
COMMISSIONER OF THE STATE OF
CONNECTICUT DEPARTMENT OF
SOCIAL SERVICES,                        :
    *Defendant*                       :      October 25, 2005

## <u>DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY</u> <u>JUDGMENT</u>

### INTRODUCTION

       This memorandum is submitted in support of the defendant's Motion for Summary

Judgment with respect to "Phase I" of the issues to be considered on remand. During a

telephonic status conference conducted on April 10, 2003, the Court ordered that the remaining

issues be determined in two phases. Phase I is whether this Court should "defer to the implicit

judgment of the Secretary that a state plan complies with federal law" on the basis of approval by

the Centers for Medicare and Medicaid Services (CMS), formerly known as the Health Care

Financing Administration (HCFA), of an amended state Medicaid plan. *Community Health*

*Center v. Wilson-Coker*, 311 F.3d 132, 140 (2d Cir. 2002). In the event Phase I does not end the

Court's inquiry, the case will proceed to Phase II, which is whether the application by the

defendant of a 4200 visit physician productivity standard to a Medicaid rate determination for

the plaintiff deprived the plaintiff of 100% of its reasonable and related costs for the rate years

in question.

The approval by CMS of Connecticut's amended state Medicaid plan in 2001 should be accorded a high level of deference. Pertinent case law, as well as the undisputed facts in this case, dictate that the Court should defer to the CMS approval of the state's plan, which included the 4200 visit productivity standard challenged by the plaintiff, as being conclusive on the question of whether the productivity standard is in conformance with the requirements of federal law.

### STATEMENT OF UNDISPUTED FACTS

This Statement of Undisputed Facts is based on the Local Rule 56 (a)(1) Statement (Statement) submitted herewith.

1. Medicaid, or Title XIX of the Social Security Act, is a joint federal and state cost-sharing program to finance medical services to indigent people. 42 U.S.C. §1396, et seq.

2. In order to qualify for participation in Medicaid, a state must formulate a State plan and submit it to the Secretary of Health and Human Services (HHS). 42 U.S.C. §1396a(b). The Secretary has delegated the power to review and approve plans and plan amendments to Regional Administrators of the Centers for Medicare and Medicaid Services (CMS), formerly known as the Health Care Financing Administration (HCFA). 42 C.F.R. § 430.15 (b).

3. After a state plan is approved, the federal government then reimburses the state for a percentage of the program's expenses. 42 U.S.C. §1396b(a); 42 C.F.R. § 430.10.

4. Each state plan must provide for payments to "federally-qualified health centers" (FQHCs), which are entities receiving direct grants from the federal government to provide primary and other health care services to "medically underserved" communities. 42 U.S.C. §§ 254b, 1396a(a)(10)(A), 1396d(a)(2)(C) and 1396d(*l*)(2)(B).

5.  Effective for services rendered on and after January 1, 2001, Congress enacted a new reimbursement mechanism for Medicaid funding of FQHCs, utilizing a prospective payment system, which requires states to pay for covered services at an FQHC:

> in an amount (calculated on a per visit basis) that is equal to 100 percent  of the average of the costs of the center or clinic of furnishing such services during fiscal years 1999 and 2000 which are reasonable and related to the cost of furnishing such services, or based on  such other tests of reasonableness as the Secretary prescribes in regulations under [Medicare]….

42 U.S.C. § 1396a(bb)(2).

6.  The law implementing the FQHC prospective payment system required that state plans reflect this new payment system.  Id.

7.  A directive to the states from HCFA dated January 19, 2001 provided that "States must submit conforming State plan amendments [to the new prospective payment system] before the end of the calendar quarter [March 31, 2001]."  Exhibit A, Affidavit of Gary Richter, ¶ 7, Attachment 1.

8.  On or about March 29, 2001, the Connecticut Department of Social Services (Department) submitted to HCFA State plan amendment 01-002 to demonstrate compliance with the new federal law regarding FQHC reimbursement.  Exhibit A, Affidavit of Gary Richter, ¶ 8, Attachment 2.  As an addendum to the State plan amendment, the Department included newly revised policy that sets forth the mechanism by which FQHC rates would be calculated in accordance with the new federal prospective payment system.   Exhibit A, Affidavit of Gary Richter, ¶ 9, Attachment 2.

9.  On or about April 12, 2001, a revised addendum to State plan amendment 01-002 was submitted to HCFA to reflect technical, non-substantive changes.  Exhibit A, Affidavit of Gary Richter, ¶ 10,  Attachment 3.

10.    On or about June 7, 2001, in response to recommendations contained in a May 21, 2001 letter from HCFA and to other comments received by the Department, the Department submitted another revised addendum to the State plan amendment 01-002.   Exhibit A, Affidavit of Gary Richter, ¶ 11, Attachment 4.

11.  On June 21, 2001, HCFA approved the Department's State plan amendment as submitted on June 7, 2001.   Exhibit A, Affidavit of Gary Richter, ¶ 12, Attachment 5.

12.  The State plan amendment  approved by HCFA on June 21, 2001 includes a 4200 visit physician productivity screen, by virtue of which the rate for each Connecticut FQHC is determined, in the absence of a waiver, based upon the higher of the actual number of patient visits per physician per year or 4200 patient visits per physician per year.   Exhibit A, Affidavit of Gary Richter, ¶ 13, Attachment 4.

13.  Connecticut has applied a 4200 visit physician productivity screen to FQHC rate determinations since the enactment of Conn. Gen. Stat. §  17b-245a in 1996.  Exhibit A, Affidavit of Gary Richter, ¶ 14.  Conn. Gen. Stat. §  17b-245a provides that "in the determination of rates for federally qualified health centers, the Commissioner of Social Services shall apply Medicare productivity standards."

14.   Federal Medicare regulations delegate to CMS (formerly HCFA) the power to establish tests of reasonableness, "including…screening guidelines."  42 C.F.R. § 405.2468(c).

15.  When HCFA and  HHS issued 42 C.F.R. § 405.2468 in 1992, a preamble to the regulation noted that HCFA planned to use a productivity screen of 4200 patient visits per full-time physician.  Exhibit B, 57 Fed. Reg. 24,961, 24,967 (June 12, 1992).

4

16. CMS uses the 4200 patient visits per full-time physician as a productivity screen for FQHCs. Exhibit C, Centers for Medicare & Medicaid Services, Rural Health Clinic and Federally Qualified Health Center Manual § 503.

17. In 1978, HCFA established screening guidelines and payments limits for Medicare and Medicaid reimbursement of Rural Health Clinic (RHC) services. Exhibit D, 43 Fed .Reg. 42787, 42788 (September 21, 1978). This process included "implement[ing] screening guidelines to assess the reasonableness of the productivity of the clinic's health care staff." Id. As to physicians, the guidelines required "[a]t least three visits per hour per physician…." Id.

18. The productivity guidelines established for RHCs in 1978 were "comparable with those used in connection with reimbursement for similar services furnished by federally funded health centers….Experience has shown them to be fair and workable." Id. Federally funded health centers were the predecessors of the FQHCs. Exhibit E, Affidavit of David Worgo, ¶ 7[1]; Exhibit F, Deposition of David Worgo, p. 85.

19. In 1980, HCFA issued a proposed rule revising the productivity screen for RHCs to 4200 visits per physician per year, which is 2.2 visits per hour per physician. Exhibit E, Affidavit of David Worgo, ¶ 10; Exhibit G, 45 Fed. Reg. 59734, 59740 (September 10, 1980). The proposal also allowed for clinics to request a waiver of the productivity guideline on the basis of "reasonable justification." Exhibit G, 45 Fed. Reg. 59740 (September 10, 1980).

20. HCFA selected the guidelines proposed in 1980 "for several reasons." Exhibit G, Fed. Reg. 59740 (September 10, 1980). One such reason was that most RHCs also received grants from the Bureau of Community Health Services (BCHS) and were thereby already subject

---

[1] This affidavit was originally submitted as Exhibit B of the Defendant's Statement of Material Facts filed in connection with the Defendant's Motion for Summary Judgment dated August 10, 2001 (Docket Entry # 41). A copy of that affidavit is attached to this Statement as Exhibit E.

to BCHS guidelines that were the same as those proposed by HCFA.  Id.  Another reason expressly stated by HCFA was that "we believe the proposed guidelines are reasonable because they are very close to our estimates of the actual average productivity of clinics now reporting their costs and utilization to HCFA."  Id.  HCFA further stated that the proposed guidelines were not incorporated into the proposed rule "because they would be subject to change from time to time."  Id.  However, HCFA noted, "we wish to obtain public comment on their use.  We will consider the comments received, and publish final guidelines in the federal register.  We will also publish a notice of any change in those guidelines."  Id.

21.  In a Final Notice issued in the Federal Register on December 1, 1982, the revised productivity screens were established for RHCs.   Exhibit E, Affidavit of David Worgo, ¶ 13; Exhibit H,  47 Fed. Reg. 54163, 54165 (December 1, 1982).  The physician productivity screen established in the Final Notice was 4200 visits per year, with a provision authorizing a waiver "when the clinic can reasonably justify its inability to comply."  Exhibit H, 47 Fed. Reg. 54166 (December 1, 1982).

22.  In addressing why these productivity screening guidelines were selected, HCFA indicated that, in addition to the fact that most RHCs received grants from BCHS, "[o]ur estimates of the actual productivity of clinics now reporting their costs and utilization to HCFA show that physicians…have average FTE productivity substantially greater than the minimum guidelines."  Id.

23.  In responding to a comment that the productivity screens should permit a lower standard for a newly added practitioner, HCFA  stated that "[w]e did not use this approach because our analysis disclosed that the effect of this guideline on clinic rates would be of little benefit to all but the smallest clinics."  Id.

24.  In responding to a comment that the guidelines were too liberal, HCFA stated that "[t]he levels of productivity specified for RHCs reflect our assessment of reasonable minimum performance levels, based on data submitted to us by RHCs.  This assessment is also supported by the experience of clinics receiving grants under the PHS [Public Health Service]  program, using similar guidelines."  Id. at 54166-54167.

25.  Prior to issuing the 1982 Final Notice establishing the revised physician productivity screen of 4200 visits per year, HCFA conducted an analysis of the productivity screens, utilizing RHC data, and made a specific determination that those screens were reasonable and effective. Exhibit E, Affidavit of David Worgo, ¶ 11; Exhibit F, Deposition of David Worgo, pp. 91-93. This analysis is reflected in statements made by  HCFA relative to the 1980 proposed rule and the 1982 Final Notice.  Exhibit G, 45 Fed. Reg. 59740 (September 10, 1980); Exhibit H, 47 Fed. Reg. 54166-54167 (December 1, 1982).

26.  In 1990, Congress amended the Social Security Act by adding "Federally qualified health center services" to the definition of "medical and other health services" offered under the Medicare program.  42 U.S.C. § 1395x (s)(2)(E).  Although there are certain differences between FQHCs and RHCs, the FQHC services and RHC services provided by physicians, physician assistants, nurse practitioners, qualified clinical psychologists, clinical social workers and certain visiting nurse services are virtually identical.  Exhibit B, 57 Fed. Reg. 24961, 24962 (June 12, 1992).

27.  In 1992, HCFA issued a "final rule with comment period" regarding payment under the Medicare program for a "new category of facility known as a Federally qualified health center."  Exhibit E, Affidavit of David Worgo, ¶ 14;  Exhibit B, 57 Fed. Reg. 24961 (June 12,

7

1992).  The effective date of the  provisions of the final rule with comment period was June 12,

1992.  Id.

28.  In its final rule with comment period, HCFA states that it is adopting the RHC

payment methodology for FQHCs, including productivity screening guidelines, and specifically

including the 4200 visit standard for physicians.  Exhibit E, Affidavit of David Worgo, ¶ 15;

Exhibit B, 57 Fed. Reg. 24967 (June 12, 1992).

29.  In discussing productivity screening guidelines, HCFA noted in 1992 that recent

changes in federal law allowed for payment to clinical psychologists and clinical social workers.

Exhibit B, 57 Fed. Reg. 24969 (June 12, 1992).  HCFA went on to indicate that it had considered

applying the same productivity screens used for physician assistants and nurse practitioners to

clinical psychologists and clinical social workers, "but because we have not had sufficient

experience with measuring appropriate productivity levels, we will not apply these screening

guidelines at this time….We intend to look at the productivity of the clinical psychologist and

clinical social worker in the future to determine what productivity screening guidelines can be

appropriately applied to these practitioners."  Id.

30.  HCFA's 1992 final rule with  comment period provided that "[w]ritten comments

will be considered if we receive them at the appropriate address, as provided below, no later than

5 p.m. on August 11, 1992."   Exhibit B, 57 Fed. Reg. 24961-24962 (June 12, 1992).

31.  Responses to comments to HCFA's 1992 final rule with comment period, including

responses to comments regarding the productivity standards, were written during the summer

and fall of 1992.  Exhibit I, Deposition of Craig Dobyski, pp. 9-10.

32. In 1993, HCFA became aware that the Health Resources and Services

Administration (HRSA) planned to stop using  productivity guidelines, including the 4200 visit

per physician guideline, for its grant-funded health centers in 1994. Exhibit E, Affidavit of David Worgo, ¶ 17; Exhibit F, Deposition of David Worgo, pp. 89-91. HCFA learned of HRSA's intentions by means of a fax transmittal sent to HCFA by HRSA in 1993. Exhibit F, Deposition of David Worgo, p. 89.

33. HCFA continued to use productivity guidelines for RHCs and FQHCs after learning that HRSA had decided to discontinue using the guidelines. Exhibit E, Affidavit of David Worgo, ¶ 18; Exhibit F, Deposition of David Worgo, pp. 91-93. HCFA continued to use the productivity guidelines because: (1) HCFA had made a specific determination that the screens were reasonable and effective, based on data from the clinics; (2) clinics or centers could request a waiver of the screens; and (3) there were no reported waiver requests by FQHCs in the previous several years. Id.

34. CMS (formerly HCFA) is not required to accept positions taken by HRSA on issues that are of mutual interest. Exhibit J, Deposition of Rhonda Rhodes, pp. 35-36.

35. In 1996, HCFA published its Final Rule regarding payment under the Medicare program for FQHCs. Exhibit K, 61 Fed. Reg. 14640 (April 3, 1996). HCFA's 1996 Final Rule included the agency's responses that had been written during the summer and fall of 1992 to comments that had been received by August 11, 1992. Exhibit K, 61 Fed. Reg. 14640-14656; Exhibit I, Deposition of Craig Dobyski, pp. 9-10.

36. If an FQHC did not meet the 4200 visit physician productivity standard in either 1999 or 2000, it had the opportunity to apply for a waiver of the screening guideline and to present reasonable justification for why screen was not met. Exhibit A, Affidavit of Gary Richter, ¶ 15, Attachment 4.

37.   The plaintiff Community Health Center, Inc. did not apply for a waiver of the 4200 visit physician productivity standard with respect to its January 1, 2001 prospective rate.  Exhibit A, Affidavit of Gary Richter, ¶ 16.   Four of the plaintiff FQHCs in the consolidated case of *Connecticut Primary Care Association, Inc. v. Wilson-Coker* (Southwest Community Health Center, Inc., Bridgeport Community Health Center, Inc., Charter Oak Health Center, Inc. and Community Health Services, Inc.) did apply for a waiver of the productivity standard with respect to their January 1, 2001 prospective rates.   Exhibit A, Affidavit of Gary Richter, ¶ 17. Final administrative decisions on those waiver applications are pending,  Id.

## ARGUMENT

### A.  STANDARD FOR GRANTING SUMMARY JUDGMENT

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c); see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden is on the moving party to demonstrate that the evidence creates no genuine issue material fact, which may be met if it can point to the absence of evidence necessary to support an essential element of the non-moving party's claim.  See *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  *Celotex Corp. v. Catrett*, supra at 323.  In order to defeat a motion for summary judgment and to be legally sufficient, the plaintiff must do more than proffer mere

conclusions and unsupported factual allegations. *Bald Mountain Park, LTD v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989). "While doubts must be resolved in favor of the party opposing the motion, the opposing party must provide 'concrete particulars' showing that a trial is needed, and '[i]t is not sufficient merely to assert a conclusion without supplying supporting arguments or facts….'" *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978).

The defendant asserts that there are no genuine issues of material fact with respect to the issue under consideration, i.e., whether the Court should  defer to the implicit judgment of the Secretary that the Connecticut amended state Medicaid plan, which includes the Medicare 4200 visit physician productivity screen,  complies with federal law, and that the defendant is entitled to have judgment entered in her favor as a matter of law.

**B.  THE COURT SHOULD DEFER TO THE DETERMINATION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES THAT THE CONNECTICUT AMENDED STATE MEDICAID PLAN COMPLIES WITH THE FEDERAL MEDICAID STATUTE**

**I.  CMS'S APPROVAL OF THE CONNECTICUT AMENDED STATE MEDICAID PLAN IS ENTITLED TO *CHEVRON* DEFERENCE**

In order to participate in the Medicaid program, a state must formulate a state Medicaid plan and submit it to the Secretary of HHS.  42 U.S.C. § 1396a(b).  The Secretary reviews each plan, and plan amendment, "to assure that it complies with a long list of federal statutory and regulatory requirements.  See id; 42 C.F.R. § 430.15(a) (2002)."  *Community Health Center v. Wilson-Coker*, 311 F.3d at 134.  The Secretary has delegated the power to review and approve plans and plan amendments to Regional Administrators of CMS.   As noted above, Connecticut's State plan amendment 01-002, which expressly referenced the 4200 visit physician productivity

screen, was approved by CMS (then known as HCFA) on June 21, 2001.  The question before

the Court at this time, as framed by the Court of Appeals, is "whether to defer to the implicit

judgment of the Secretary that a state plan complies with federal law."  A consideration of the

principles of deference as articulated in pertinent case law demonstrates that such deference

should be accorded to the approval of Connecticut's State plan amendment 01-002:

> We have long recognized that considerable weight should be accorded to an
> executive department's construction of a statutory scheme it is entrusted to
> administer, and the principle of deference to administrative interpretations "has
> been consistently followed by this Court whenever decision as to the  meaning or
> reach of a statute has involved reconciling conflicting policies, and a full
> understanding of the force of the statutory policy in the given situation has
> depended upon more than ordinary knowledge respecting the matters subjected to
> agency regulations."

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 844 (1984).

Under the principles of deference articulated in *Chevron*, an agency pronouncement is

entitled to mandatory deference "when it appears that Congress delegated authority to the agency

generally to make rules carrying the force of law, and that the agency interpretation claiming

deference was promulgated in the exercise of that authority."    *United States v. Mead Corp*., 533

U.S. 218, 226-27 (2001).  Courts have consistently recognized that broad deference is all the

more warranted with respect to Medicare and Medicaid, which are "'complex and highly

technical regulatory program[s],' in which the identification and classification of relevant

'criteria necessarily require significant expertise and entail the exercise of judgment grounded in

policy concerns.'" *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (Citations

omitted); *Community Health Center v. Wilson-Coker*, supra at 138 ("We take care not lightly to

disrupt the informed judgments of those who must labor daily in the minefield of often arcane

policy, especially given the substantive complexities of the Medicaid statute."); *Perry v.*

*Dowling*, 95 F.3d 231, 236 (2d Cir. 1996) ("Such deference is particularly warranted with respect to interpretations of the Social Security Act, because of the Act's intricate nature.")

In *Pharmaceutical Research and Manufacturers of America v. Thompson*, 362 F.3d 817 (D.C. Cir. 2004), the Court squarely addressed the question of what level of deference should be accorded the approval of a state Medicaid plan amendment by the Secretary of HHS.  The appellants in *Pharmaceutical Research* had alleged that a prescription drug coverage program included in a proposed state Medicaid plan amendment submitted to the Secretary by the State of Michigan violated the Medicaid statutes.   Those appellants further asserted that the Secretary's interpretation of the pertinent statutes, as reflected in the approval of the state plan amendment, was "due only minimal deference, if any…."  Id at 821.  The Court soundly rejected the contentions of the appellants and concluded that the Secretary's approval of the state plan amendment was entitled to mandatory, *Chevron* deference:

> [Appellants']  argument overlooks the nature of the Secretary's authority.  This is not a case of implicit delegation of authority through the grant of general implementation authority .  In the case of the Medicaid payment statute, the Congress expressly conferred on the Secretary authority to review and approve state Medicaid plans as a condition to disbursing federal Medicaid payments….In carrying out this duty, the Secretary is charged with ensuring that each state plan complies with a vast network of specific statutory requirements….Through this "express delegation of specific interpretive authority," *Mead*, 533 U.S. at 229, the Congress manifested its intent that the Secretary's determinations, based on interpretation of the relevant statutory provisions, should have the force of law. The Secretary's interpretations of the *Medicaid Act* are therefore entitled to *Chevron* deference.

Id at 821-822 (Citations omitted); *Texas v. United States Department of Health and Human Services*, 61 F.3d 438 (5th Cir. 1995) (*Chevron* deference accorded to HHS denial of state plan amendment).  See  *Perry v. Dowling*, 95 F.3d 231, 237 (2d Cir. 1996) (Secretary's interpretation of Medicaid statute as reflected in approval of state plan warrants considerable deference).

"The circumstances under which an agency pronouncement is due mandatory, Chevron deference are not entirely clear." *Kruse v. Wells Fargo Home Mortgage, Inc*., 383 F.3d 49, 58 (2d Cir. 2004). As indicated by the Second Circuit in *Community Health Center*, however, the Secretary's interpretation of the Medicaid statute implicit in the approval of the amended Connecticut state Medicaid plan clearly is entitled to considerable deference:

> We observe that, as provided in regulations, "CMS regional staff reviews State plans and plan amendments, discusses any issues with the Medicaid agency, and consults with central office staff on questions regarding application of Federal policy." 42 C.F.R. § 430.14 (2002). We take care not lightly to disrupt the informed judgments of those who must labor daily in the minefield of often arcane policy, especially given the substantive complexities of the Medicaid statute.

311 F.3d at 138. Consistent with the rationale expressed by the D.C. Circuit in *Pharmaceutical Research* and by other Courts of Appeal that have considered the issue, including the Second Circuit in *Perry* and *Community Health Center*, the judgment of the Secretary of HHS that the Connecticut amended state Medicaid plan complies with the Medicaid statute, which judgment is reflected in the approval of that plan by HHS, should be accorded *Chevron*, or mandatory, deference.


**II  THE SECRETARY'S INTERPRETATION OF THE MEDICAID STATUTE, AS EXPRESSED IN THE SECRETARY'S APPROVAL OF THE CONNECTICUT AMENDED STATE MEDICAID PLAN, SHOULD BE GIVEN CONTROLLING WEIGHT**

In a case where *Chevron* deference applies, the reviewing court "must defer to the interpretation…[the agency] advances unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'… So long as 'the agency's reading fills a gap or defines a term in a reasonable way in light of the Legislature's design, we give that reading controlling weight, even if it is not the answer the court would have reached if the question initially had arisen in a judicial

proceeding.'"  *Kruse v. Wells Fargo Home Mortgage, Inc*., supra at 55 (Citations omitted).  The

interpretation advanced by the Secretary that the Connecticut amended state Medicaid plan

complies with the Medicaid statute is not manifestly contrary to the statute, nor is it arbitrary or

capricious.  Consequently, under the controlling principles of deference, that interpretation

should be given   controlling weight.

## A.  THE SECRETARY'S INTERPRETATION IS NOT MANIFESTLY CONTRARY TO THE STATUTE

As previously noted, the Secretary is required by statute to review each state Medicaid

plan amendment "to assure that it complies with a long list of federal statutory and regulatory

requirements."  *Community Health Center v. Wilson-Coker*, supra at 134.  With respect to the

amended state plan proposed by Connecticut in 2001, this review necessarily involved assuring

that the amendment complied with the requirement in the Medicaid statute that states pay for

covered services at an FQHC "in an amount (calculated on a per visit basis) that is equal to 100

percent of the average of the costs of the center or clinic of furnishing such services during fiscal

years 1999 and 2000 which are reasonable and related to the  cost of furnishing such services…."

42 U.S.C. § 1396a(bb)(2).  The approved amendment to the Connecticut state plan included a

physician productivity screen, which "imposes a minimum-visit requirement on affected

providers."  *Community Health Center*, supra at 134.

A physician productivity screen is certainly not "manifestly contrary" to the statutory

requirement that a state plan provide for 100 percent of costs which are reasonable and related to

the costs of providing services.   The word "manifest" is "synonymous with open, clear, visible,

unmistakable, indubitable, indisputable, evident and self-evident."  Black's Law Dictionary  (6th

Ed. 1990); Cf. *Guy v. Crown Equipment Corp*., 394 F.3d 320, 325 (5th Cir. 2004) (Manifest error

is one that is plain and indisputable); Compare with *Wolke v. Dreadnought Marine, Inc*., 954

F.Supp. 1133, 1137 n.6 (E.D.Va. 1997) (Department of Labor regulation that purported to

transform employees ineligible for benefits under express provisions of FMLA statute into

eligible employees was "manifestly contrary to the statute").    As noted by the Second Circuit,

"[t]he Medicare statute provides for payment of the 'reasonable cost' of services rendered, ...and

directs the Secretary to define 'reasonable' in regulations....  The Secretary's regulations, in turn,

delegate to CMS the power to establish tests of reasonableness, 'includ[ing]...screening

guidelines.'"  *Community Health Center*, supra at 135.[2]

**B.  THE SECRETARY'S INTERPRETATION IS NOT ARBITRARY OR CAPRICIOUS**

The arbitrary and capricious standard of review is well-established:

The arbitrary and capricious standard of review is narrow and particularly
deferential....We reverse the agency only when there has been a "clear error of
judgment."...Our task under this standard is to decide if the agency has
considered the evidence, examined the relevant factors, and spelled out a
satisfactory rationale for its action including the demonstration of a reasoned
connection between the facts it found and the choice it made.

*Environmental Defense v. United States Environmental Protection Agency*, 369 F.3d 193, 201

(2d Cir. 2004) (Citations omitted).    So long as an agency rule conforms to "'certain minimal

standards of rationality,'" it must be upheld.  *Small Ref. Lead Phase-Down Task Force v.*

*U.S.E.P.A.*, 705 F.2d 506, 520-521 (D.C. Cir. 1983) (Citations omitted); see also *LeFevre v.*

*Secretary, Dept. of Veterans Affairs*, 66 F.3d 1191, 1199 (Fed. Cir. 1995) ("This is a 'highly

deferential' standard of review").

Since 1996, the Department has been required by Connecticut statute to apply Medicare

productivity standards in determining Medicaid rates for FQHCs.  Conn. Gen. Stat. §  17b-245a.

_____

[2] As noted by the Second Circuit,  the term "reasonable" as defined by the Secretary for purposes
of Medicare need not have the same meaning as that term is defined by the Secretary for
purposes of Medicaid.  311 F.3d at 137.  Clearly, however, the establishment of productivity

One productivity standard applied by Medicare to FQHCs is a 4200 visit physician productivity

screen.  Exhibit C, Centers for Medicare & Medicaid Services, Rural Health Clinic and Federally

Qualified Health Center Manual § 503.   CMS (formerly HCFA) has applied that productivity

screen to FQHCs since Medicare rules for FQHCs  first went into effect in 1992.  Exhibit B, 57

Fed.Reg. 24,961, 24,967 (June 12, 1992).   The Department incorporated the Medicare 4200

visit physician productivity screen, which it had been utilizing since 1996, into the 2001

amended Connecticut state Medicaid plan.  Exhibit A, Affidavit of Gary Richter, ¶ 13.

     At various times between  1978 and 1996, HCFA (now CMS) published statements in

the Federal Register concerning its use of a physician productivity screen and, more specifically,

a 4200 visit productivity screen.  These publications included statements of the reasons why

HCFA used the 4200 visit screen.   In some instances those statements were admittedly less than

ideal.  A reviewing court will, however, "uphold a decision of less than ideal clarity if the

agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight

Sys., Inc*., 419 U.S. 281, 286 (1974).   "Within this limited scope of review, a  court must

undertake a searching inquiry into the facts and satisfy itself that the agency has articulated a

'rational connection between the facts found and the choice made.'"  *Hudson Transit Lines Inc.

v. I CC*, 765 F.2d 329, 336 (2d Cir. 1985); see *Henley v. Food and Drug Administration*, 77 F.3d

616, 620 (2d Cir. 1996).   A careful, comprehensive review of statements made by CMS relative

to the use of the 4200 visit screen reveals a "rational connection between the facts found and the

choice made."

     In addition to CMS statements  published in the Federal Register, the defendant has

produced other evidence of an explanatory nature, in the form of affidavits and deposition

---

screens, under either Medicare or Medicaid, is not manifestly contrary to a statutory requirement

transcripts, which sheds additional light on the actions taken by CMS with respect to the 4200 visit standard. This material is particularly illuminating in terms of CMS' determination that the screen is reasonable and effective, as well as with respect to certain statements published in the Federal Register in 1996. While it is true that an agency action must be judged on the basis on which it was taken, and not on a new basis developed in litigation to justify the action; *Motor Vehicle Mfr. Assn. v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 50 (1983); it is equally true that:

> The rule against post-hoc rationalization does not prevent a court from considering a more detailed explanation of an agency's action in response to a legal challenge. As long as the agency does not present a new basis for its action, it may supply a clearer or more detailed explanation….The key distinction is the difference between a post hoc rationalization, which is a new rationale for an agency action, and a post hoc explanation, which is an agency's discussion of the previously-articulated rationale for the challenged action. Post hoc rationalizations are precluded; post hoc explanations are not.

*National Oilseed Processors Assn. v. Browner*, 924 F.Supp. 1193, 1204 (D.D.C. 1996), affirmed in part, remanded in part sub nom *Troy Corp. v. Browner*, 120 F.3d 277 (D.C. Cir. 1997); *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 209 (1st Cir. 1999) (Affidavits and depositions "explanatory of the decisionmakers' action at the time it occurred" may be considered by court reviewing agency action).

The origins of the 4200 visit productivity screen can be traced back to 1978, when HCFA (CMS) announced screening guidelines applicable to Rural Health Clinics (RHCs) for purposes of Medicare and Medicaid reimbursement. At that time, the productivity guideline for physicians was set at three visits per hour per physician. Exhibit D, 43 Fed. Reg. 42787, 42788 (September 21, 1978). HCFA noted that these screens were similar to those applied to other federally funded health centers and that "experience has shown them to be fair and workable."

---

of payment of reasonable costs.

Id.  HCFA further noted that it planned to evaluate the use of the screens based on actual program experience and would consider revisions if they appeared necessary.  Id.

In 1980, HCFA announced its proposal to change the productivity guideline for RHC physicians to 4200 visits per year per full-time equivalent physician.  Exhibit G, 45 Fed. Reg. 59734, 59739-40 (September 10, 1980).  This is the equivalent of approximately two visits per hour per physician, instead of three.  Exhibit E, Affidavit of David Worgo, ¶ 10.  The proposal also allowed for clinics to request a waiver of the productivity guideline on the basis of "reasonable justification."  Exhibit G, 45 Fed. Reg. 59740 (September 10, 1980).

HCFA selected the guideline proposed in 1980 "for several reasons."  Id.  One reason given for the change to 4200 visits was HCFA's understanding that the majority of RHCs also received grants from the Bureau of Community Health Services (BCHS) and were thereby already subject to BCHS guidelines that were the same as those proposed by HCFA.  Id. Another reason expressly stated by HCFA was that "we believe the proposed guidelines are reasonable because they are very close to our estimates of the actual average productivity of clinics now reporting their costs and utilization to HCFA."  Id.  HCFA further stated that the proposed guidelines were not incorporated into the proposed rule "because they would be subject to change from time to time."  Id.  However, HCFA noted, "we wish to obtain public comment on their use.  We will consider the comments received, and publish final guidelines in the federal register.  We will also publish a notice of any change in those guidelines."  Id.

In a Final Notice issued in the Federal Register on December 1, 1982, the revised productivity screens were established for RHCs.  Exhibit E, Affidavit of David Worgo, ¶ 13; Exhibit H, 47 Fed. Reg. 54163, 54165 (December 1, 1982).  The physician productivity screen established in the Final Notice was 4200 visits per year, with a provision authorizing a waiver

"when the clinic can reasonably justify its inability to comply."  Exhibit H, 47 Fed. Reg. 545166 (December 1, 1982).  In addressing why these productivity screening guidelines were selected, HCFA indicated that, in addition to the fact that most RHCs received grants from BCHS, "[o]ur estimates of the actual productivity of clinics now reporting their costs and utilization to HCFA show that physicians…have average FTE productivity substantially greater than the minimum guidelines."  Id.

In responding to a comment that the productivity screens should permit a lower standard for a newly added practitioner, HCFA stated that "[w]e did not use this approach because our analysis disclosed that the effect of this guideline on clinic rates would be of little benefit to all but the smallest clinics."  Id.  In responding to a comment that the guidelines were too liberal, HCFA stated that "[t]he levels of productivity specified for RHCs reflect our assessment of reasonable minimum performance levels, based on data submitted to us by RHCs.  This assessment is also supported by the experience of clinics receiving grants under the PHS [Public Health Service] program,  using similar guidelines."  Id. at 54166-54167.

Prior to issuing the 1982 Final Notice establishing the revised physician productivity screen of 4200 visits per year, HCFA conducted an analysis of the productivity screens, utilizing RHC data, and made a specific determination that those screens were reasonable and effective. Exhibit E, Affidavit of David Worgo, ¶ 7; Deposition of David Worgo, pp. 91-93.  This analysis is reflected in statements made by HCFA relative to the 1980 proposed rule and the 1982 Final Notice.  Exhibit G, 45 Fed. Reg. 59740 (September 10, 1980); Exhibit H, 47 Fed. Reg. 54166-54167 (December 1, 1982).

In 1990, Congress amended the Social Security Act by adding "Federally qualified health center services" to the definition of "medical and other health services" offered under the

Medicare program.  42 U.S.C. § 1395x (s)(2)(E).  Although there are certain differences between FQHCs and RHCs, the FQHC services and RHC services provided by physicians, physician assistants, nurse practitioners, qualified clinical psychologists, clinical social workers and certain visiting nurse services are virtually identical.  Exhibit B, 57 Fed. Reg. 24961, 24962 (June 12, 1992).

In 1992, HCFA issued a "final rule with comment period" regarding payment under the Medicare program for a "new category of facility known as a Federally qualified health center," Exhibit E, Affidavit it David Worgo, ¶ 14; Exhibit I, 57 Fed. Reg. 24961 (June 12, 1992).  The effective date of the provisions of the final rule with comment period was June 12, 1992.  Id.  In its final rule with comment period, HCFA states that it is adopting the RHC payment methodology for FQHCs, including productivity screening guidelines, and specifically including the 4200  visit standard for physicians.  Exhibit E, Affidavit of David Worgo, ¶ 15; Exhibit I, 57 Fed.Reg. 24967 (June 12, 1992).

In discussing productivity screening guidelines, HCFA noted in 1992 that recent changes in federal law allowed for payment to clinical psychologists and clinical social workers.  Exhibit I, 57 Fed. Reg. 24969 (June 12, 1992).  HCFA went on to indicate that it had considered applying the same productivity screens used for physician assistants and nurse practitioners to clinical psychologists and clinical social workers, "but because we have not had sufficient experience with measuring appropriate productivity levels, we will not apply these screening guidelines at this time….We intend to look at the productivity of the clinical psychologist and clinical social worker in the future to determine what productivity screening guidelines can be appropriately applied to these practitioners."  Id.

HCFA's 1992 final rule with comment period provided that "[w]ritten comments will be considered if we receive them at the appropriate address, as provided below, no later than 5 p.m. on August 11, 1992." Exhibit I, 57 Fed. Reg. 24962-24963 (June 12, 1992). Responses to comments to HCFA's 1992 final rule with comment period, including responses to comments regarding the productivity standards, were written during the summer and fall of 1992. Exhibit J, Deposition of Craig Dobyski, pp. 9-10.

In 1993, HCFA became aware that the Health Resources and Services Administration (HRSA)[3] planned to stop using productivity guidelines, including the 4200 visit per physician guideline, for its grant-funded health centers in 1994. Exhibit E, Affidavit of David Worgo, ¶ 17; Exhibit F, Deposition of David Worgo, pp. 89-91. HCFA learned of HRSA's intentions by means of a fax transmittal sent to HCFA by HRSA in 1993. Exhibit F, Deposition of David Worgo, p. 89. HCFA continued to use productivity guidelines for RHCs and FQHCs after learning that HRSA had decided to discontinue using the guidelines. Exhibit E, Affidavit of David Worgo, ¶ 18; Deposition of David Worgo, pp. 91-93. HCFA continued to use the productivity guidelines because: (1) HCFA had made a specific determination that the screens were reasonable and effective, based on data from the clinics; (2) clinics or centers could request a waiver of the screens; and (3) there were no reported waiver requests by FQHCs in the previous several years. Id. Although CMS will consult with HRSA about issues of common interest, CMS is not required to accept positions taken by HRSA on such issues. Exhibit J, Deposition of Rhonda Rhodes, pp. 35-36.

In 1996, HCFA published its Final Rule regarding payment under the Medicare program for FQHCs. Exhibit K, 61 Fed. Reg. 14640 (April 3, 1996). HCFA's 1996 Final Rule included

the agency's responses that had been written during the summer and fall of 1992 to comments that had been received by August 11, 1992 in response to the 1992 final rule with comments period.  Exhibit K, 61 Fed. Reg. 14640 (April 3, 1996); Exhibit I, Deposition of Craig Dobyski, pp. 9-10.  In response to a comment that questioned the appropriateness of the productivity screening guidelines, HCFA stated the following:  "We use the same guidelines applied by HRSA….We believe it is appropriate to use uniform productivity guidelines rather than developing separate guidelines."  Id.  Again, this response was drafted in 1992, as were all responses to comments timely filed, at a time when HRSA was still applying productivity guidelines.

Without question it would have been appropriate for HCFA to amend the response which was drafted in 1992 prior to its publication in 1996, since by 1996 HRSA no longer used productivity guidelines.  The fact that this particular response was not amended does not mean, however, that the continued use of the 4200 physician productivity standard by CMS was arbitrary or capricious.  "'This court's task is to scrutinize the [agency's] activity to determine whether the record reveals that a rational basis exists for its decision.'"  *1000 Friends of Maryland v. Browner*, 265 F.3d 216, 235 (4th Cir. 2001) (Citation omitted).  The record reveals that HCFA had made a series of statements of a period of years that clearly articulated a rational basis for the 4200 visit standard:  HCFA had concluded that its use of the productivity standards, as distinguished from HRSA's use,  was reasonable and effective.  In arriving at this conclusion, HCFA had conducted its own analysis of the productivity screens, utilizing RHC data, and determined that "[t]he levels of productivity specified for RHCs reflect our assessment of

---

[3] HRSA administers grant programs authorized by the Public Health Service Act, including grants to RHCs.  See 42 U.S.C. § 254b (o).

reasonable minimum performance levels, based on data submitted to us by RHCs." Exhibit H, 47 Fed. Reg. 54166-54167 (December 1, 1982).

As previously noted, HCFA adopted the RHC payment methodology for FQHCs, including productivity screening guidelines, because of the similarities between FQHCs and RHCs: "We considered using several methodologies for payment to FQHCs, but because the benefit is so similar to the RHC benefit, we believe that for simplicity and administrative ease, it is more feasible to adopt the RHC methodology for FQHCs." Exhibit B, 57 Fed. Reg. 24967 (June 12, 1992). The similarities between these two types of health centers provides a rational basis for applying the RHC payment methodology to FQHCs, including the 4200 visit physician productivity standard. Because HCFA had already articulated a rational basis for utilizing the productivity standards with RHCs, and had also articulated a rational basis for applying the RHC methodology to FQHCs, there simply was no need to repeat the basis for the standards when issuing rules applicable to FQHCs in 1992 or 1996. While it is unfortunate that the 1996 responses to comments contained a statement that was, by the time of publication, inaccurate, that statement should not be considered in isolation and does not negate the previous statements that amply demonstrate a rational basis for the productivity standard.

## CONCLUSION

Based on the undisputed facts and the law set forth herein, this Court should "defer to the implicit judgment of the Secretary that a state plan complies with federal law" on the basis of approval by CMS of the Connecticut amended state Medicaid plan and should grant the defendant's Motion for Summary Judgment.

DEFENDANT
PATRICIA WILSON-COKER,
COMMISSIONER OF THE STATE OF
CONNECTICUT DEPARTMENT OF
SOCIAL SERVICES


RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:    /s/_____
       Thomas J. Ring
       Assistant Attorney General
       Federal Bar No. ct08293
       55 Elm Street
       P.O. Box 120
       Hartford, CT  06141-0120
       Tel: (860) 808-5210
       Fax: (860) 808-5385
       Thomas.Ring@po.state.ct.us

# **CERTIFICATION**

I hereby certify that a copy of the foregoing  Memorandum in Support of Motion for

Summary Judgment  was mailed in accordance with Rule 5(b) of the Federal Rules of Civil

Procedure on this 25th day of  October, 2005,  first class postage prepaid to:

Attorney Richard R. Brown
Brown, Paindiris & Scott
100 Pearl Street
Hartford, CT 06103

Attorney James L. Feldesman
Feldesman, Tucker, Leifer, Eidell and Bank
2001 L Street, N.W.
Washington, D.C. 20036

Lauren M. Nash, Assistant United States Attorney
P.O. Box 1824
New Haven, CT 06508

Attorney Marilyn B. Fagelson
Murtha Cullina LLP
2 Whitney Avenue
P.O. Box 704
New Haven, CT 06503-00704

/s/_____
Thomas J. Ring
Assistant Attorney General