UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x

COMMUNITY HEALTH CENTER, INC., :

        Plaintiff,    :

   -vs-                        : CHANCERY NO. 172862

PATRICIA WILSON-COKER, J.D.,   :

M.S.W., COMMISSIONER OF THE    :

STATE OF CONNECTICUT            :

DEPARTMENT OF SOCIAL SERVICES, :

        Defendant.    :

- - - - - - - - - - - - - - - - - x

                    Baltimore, Maryland

                    Thursday, September 25, 2003

Deposition of:

        DAVID L. WORGO

    A witness, called for examination by counsel for the plaintiff, pursuant to notice, at 7500 Security Boulevard, Baltimore, Maryland, beginning at 10:13 a.m., before JOSEPH A. INABNET, a Court Reporter and Notary Public in and for the State of Maryland at Large.

COPY

1   productivity screens for purposes of Medicare?

2       A.   Yes.

3       Q.   And what is that productivity screen as

4   to physicians?

5       A.   Well, I guess I'm a little confused

6   because I interpret this to mean that the State of

7   Missouri is using Medicare's original productivity

8   screens, which were more -- which were more

9   stringent than the productivity screens currently

10  in use under Medicare for both RHCs and FQHCs.

11      Q.   And what leads you to that conclusion?

12      A.   Because we had a formal program or

13  benefit referred to as the Federally Funded Health

14  Clinic program, and that program was superseded by

15  the FQHC program --

16      Q.   I see.

17      A.   -- and the RHC program.

18           So let me quickly clarify.  I mean, this

19  could mean that they are using the either the old

20  more stringent Medicare productivity screens that

21  applied to the Federally Funded Health Center that

22  existed prior to that, to the Medicare FQHC

```
 1            MR. RING:  Well, you have made your
 2   objection for the record, and apparently we don't
 3   read the Second Circuit decision the same way.
 4   BY MR. RING:
 5       Q.   So could you start by telling me when
 6   HCFA became aware that HRSA was eliminating the
 7   physician productivity guidelines?
 8       A.   It's in the documents that we furnished.
 9            I'm sorry.  I did not commit the specific
10   date and time.
11            HRSA faxed over a copy of their formal
12   decision, and it's in one of the attachments here.
13   I can look up to the date of the facsimile.
14       Q.   So to the best of your knowledge, it was
15   by means of that fax that HCFA became aware of the
16   proposal or the plan by HRSA to eliminate the
17   guideline?
18       A.   Correct.
19       Q.   And that was in 1993.  Is that correct?
20       A.   Yeah -- I believe so.  It was in '93.
21       Q.   Okay.  And that -- the fax that was
22   received on that, did that receipt of that
```

Case 3:01-cv-00146-JBA   Document 115-5   Filed 10/26/2005   Page 4 of 8
COMMUNITY HEALTH CENTER                          DAVID WORGO
VS. PATRICIA WILSON-COKER, ET AL.           SEPTEMBER 25, 2003

Page 90

1   information initiate the process that led to the

2   drafting of that memo which was discussed at the

3   previous deposition which was not produced based on

4   a claim of privilege?

5        A.   Correct.

6        Q.   And if I understood your earlier

7   testimony, that memo that was not produced was

8   created close in time to when that fax was received

9   by HCFA?

10       A.   Correct.

11       Q.   And who drafted that memo again, the

12  internal memo?

13       A.   The internal memo was from Bernadette

14  Shumacher, the division director at that time

15  within the Center for Medicare responsible for

16  FQHC/RHC policies.

17            She communicated by letter, by memo, to

18  her supervisor Cathy Buto.

19       Q.   Okay.  And I believe that they -- that

20  the notification from HRSA indicated, even though

21  it was sent in 1993, that the cessation of the

22  guidelines would actually occur in 1994.

```
 1              Is that correct?
 2       A.     Correct.
 3       Q.     And what I would like to do then is move
 4   on to the third point in my letter, which is the
 5   reason or reasons why HCFA continued to utilize
 6   physician productivity guidelines after HRSA
 7   stopped using such guidelines.
 8              Could you please address that point for
 9   me?
10       A.     My understanding regarding CMS's
11   continued use of the productivity screen is based
12   on two reasons.
13              One is that we applied productivity
14   screens back to the Federally Funded Health Center
15   program, which existed in 1970.  And we made a
16   specific determination using clinic data that those
17   screens were reasonable and effective.
18              I believe the second reason for our
19   continued use is due to the fact that we provide
20   Medicare contractors with authority to waive the
21   productivity screen for reasonable justification.
22              And in light of that waiver authority and
```

1   no reported waiver requests submitted by any FQHC

2   in the previous several years as well as a limited

3   number of waiver requests being submitted by RHCs,

4   due to those two reasons, we continue to use the

5   productivity screens.

6         Q.   Now, you said that this was your

7   understanding.  I wanted to ask you.

8              What is the basis of your understanding

9   as to these reasons why the productivity screens

10  continued to be used?

11        A.   The basis?

12        Q.   Yeah.

13        A.   The basis would be that CMS specifically

14  analyzed the clinic data to determine whether the

15  productivity screens were reasonable.

16             And the second basis would be the fact

17  that we have this waiver authority and a limited

18  number of clinics or centers have utilized or

19  requested a waiver of the productivity screens,

20  which would mean that most or all health centers

21  satisfy the productivity screens.

22        Q.   Do you know who made the decision to

1    continue utilizing the productivity standards for
2    FQHCs under Medicaid after or -- after the --
3    Medicare, I should say -- after the HRSA
4    notification?
5         A.   I do not know specifically which manager
6    made the decision, no.
7         Q.   Now, you made reference to an analysis
8    done by CMS -- I presume at the time it was HCFA --
9         A.   Correct.
10        Q.   -- analyzing clinic data relative to
11   those screens; correct?
12        A.   Correct.
13        Q.   Do you know when that analysis was done?
14        A.   According to our regulations, it was
15   conducted, I want to say in 1980 or late '80 --
16   late '70s or early '80s.
17             I would have to go back through the
18   documents to give you a precise date.
19             But I recall that it was -- I want to say
20   around 1980.
21        Q.   Do you know who was involved in
22   conducting that analysis?

## CERTIFICATE OF NOTARY PUBLIC

I, Joseph A. Inabnet, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in Stenotype and thereafter reduced to typewriting under my supervision; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____
Joseph A. Inabnet, Notary Public
for the State of Maryland

My Commission Expires:  January 29, 2007