UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| COMMUNITY HEALTH CENTER, INC., *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v.   ) | Lead Docket No. |
| ) | Civil Action No. 301cv146(JBA) |
| PATRICIA WILSON-COKER, J.D., M.S.W., ) | |
| COMMISSIONER OF THE ) | |
| STATE OF CONNECTICUT ) | |
| DEPARTMENT OF SOCIAL SERVICES, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### BACKGROUND

As this Court is well aware, the Second Circuit's decision[1] on appeal of this Court's earlier determination[2] was concerned with a physician productivity "screen" of 4,200 visits per year used by the Connecticut Department of Social Services ("DSS") in establishing the "reasonable costs" of Federally-qualified health centers ("FQHCs"). The decision requires this Court, on remand, to determine "whether [that] productivity screen passes statutory muster on its own terms." Wilson-Coker appeal at 139. In making that

---

[1] *Community Health Center v. Wilson-Coker*, 311 F.3d 132 (2nd Cir. 2002) ("Wilson-Coker appeal").

[2] *Community Health Center v. Wilson-Coker*, 175 F. Supp. 2d 332 (D. Conn. 2001).

1

determination, this Court is to "consider anew what role CMS's[3] approval of the Connecticut State Plan should play in assessing the reasonableness of the 4,200 productivity screen." *Id.* at 140.

## ARGUMENT

The productivity screen at issue was the product of a State 1996 legislative enactment. Wilson-Coker appeal at 134. It was put into use by DSS for Connecticut's Medicaid program once that State law was passed. In so doing, DSS neglected to amend Connecticut's State Medicaid plan to incorporate the screen.[4] Only after this case was filed, five years after the 1996 enactment, was that amendment made.[5] As we show below, the productivity screen fails to pass statutory muster.

A.   Issues on Remand

From the beginning of its opinion (*Id.* at 133) through part I of its "Discussion" (*Id.* at 139), the sole concern of the Appeals Court was this Court's determination that a definition of FQHC reasonable costs under the State of Connecticut's Medicaid program was governed exclusively by CMS's FQHC *Medicare* regulations. CMS, in an *amicus* capacity before the Second Circuit, pointed out that its "read" of the FQHC payment

---

[3] CMS refers to the Centers for Medicare and Medicaid Services, the new name for the Health Care Financing Administration (HCFA"). CMS administers the Medicaid program within the Department of Health and Human Services ("HHS").

[4] The State Plan in effect prior to January 1, 2001 contained a screen of 3,400 physician visits per year. SF ¶ 3.

[5] Because the Joint Appendix ("JA") filed with the Second Circuit reflects defendant's best case (defendant, as Appellant, had the principal responsibility for preparing it), we file a copy of the Appendix with this motion (as Exhibit A) and later refer to its contents. According to JA90, the plan amendment (later modified prior to approval) was first submitted to CMS by the State on March 29, 2001. The date of CMS approval was June 21, 2001, with a January 1, 2001 effective date. SF ¶ 5, JA 88.

provision of the Medicaid statute was that the provision permitted States to make their own reasonable cost determinations.

The Appeals Court's central question became whether to adopt CMS's view that the law gave States the latitude to define reasonable costs. Once the Appeals Court determined that CMS's "permissible reading of the statute [was] entitled to [that Court's] deference",[6] that Court turned to an issue that this "never reached by this Court;" *i.e.* an issue raised by plaintiff "[a]t oral argument": "whether Connecticut's 4200 productivity screen passes statutory muster on its own terms". *Id.* In that regard, the decision assigned this Court first crack at that issue and then described what this Court should do to decide it.

As to this Court's assigned tasks, the Appeals Court first stated that it was not concerned with the prior finding "of irregularities in the administrative record underlying [CMS's] decision to implement the [productivity] screen (*Id.* at 140) but "whether or not [the screen] provides for all 'reasonable and related' costs *under the Medicaid statute*". *Id.* (Emphasis added.) Regarding that question, the Appeals Court said that it "may well be . . . entirely different . . . from whether an identical *federal* provision is invalid for failure to comply with the technical requirements of the Administrative Procedure Act." *Id.* (Emphasis in original.)

With the foregoing as introduction, the Appeals Court then gave this Court specific instructions:

> Therefore, on remand, the district court must consider anew what role CMS's approval of the Connecticut State Plan should

---

[6] The Secretary's permissible reading was given deference because CMS issued "no authoritative regulations" on the subject, giving States the latitude to step in with their own definitions of reasonable costs. (Wilson-Coker appeal at 137)

3

> play in assessing the reasonableness of the 4,200 productivity screen. That the district court did not grant CMS's approval any deference, *Cmty. Health Ctr.*, 175 F.Supp.2d at 348, is not relevant to the district court proceedings on remand, because that decision was premised on an interpretation of § 1396a(bb) that we have now reversed. The district court therefore should consider whether to defer to the implicit judgment of the Secretary that a state plan complies with federal law. *See Concourse Rehab. & Nursing Ctr. Inc. v. Whalen*, 249 F.3d 136, 145 (2d Cir.2001) (citing *Perry v. Dowling*, 95 F.3d 231, 236-37 (2d Cir. 1996); *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1313 (2d Cir. 1991). In making this determination, the district court should bear in mind the principles of deference that we have outlined above. Deference, however, even at its highest levels, is not a "rubber stamp[ ]." *Pinnacle Nursing Home*, 928 F.2d at 1314. In assessing the reasonableness of CMS's decision, the district court may consider the materials submitted by Connecticut in support of its plan, and the factors considered by CMS in evaluating those materials.

Wilson-Coker appeal at 139. (Footnote omitted.)

In response, after remand, this Court accepted the invitation of the Appeals Court to "consider" what Connecticut submitted to CMS and what "factors" CMS then considered. It did so by authorizing discovery as against CMS. The discovery process is now over. Based on that process and the written record of this case, it is clear that absolutely nothing in Connecticut's submission of the State Plan amendment or CMS's approval of that amendment in any way, shape or form validated the productivity screen.

B. <u>Focus on CMS</u>

Although the Second Circuit's reversal depended on its finding that States could determine reasonable costs, its decision focuses on what CMS may have done rather than the State's reasonable cost determination. The reason for the Second Circuit's focus on CMS derives from the fact that DSS made no findings (nor did any other State agency including the legislature) about the propriety (legal or otherwise) of the screen at issue as

4

an incident to adopting the screen for the Medicaid program.[7] Likewise, in seeking CMS's approval of the State plan amendment, DSS provided no justification for the screen or assurance that the screen did not affect coverage of an FQHC's reasonable costs as a CMS letter, discussed below, requires. Indeed, defendant's entire case for the screen's underlying legitimacy has rested on CMS's adoption of that screen for the FQHC Medicare program.[8]

The remand provides this Court with the opportunity to examine the legal impact of Connecticut's failure in this regard.[9] As to that legal impact, the beginning point is that Connecticut's decision to employ the Medicare FQHC program's productivity screen for its Medicaid program violated a specific CMS directive as to which, according to the Appeals Court's decision in this case, "respectful consideration [is] due . . ." *Id.* at 138 (citing *Wis. Dep't of Health and Family Servs.* v. *Blumer* 534 U.S. 473, 479 (2002) and other cases). The violated directive, at JA92, is a May 8, 1995 letter from the then Director of CMS's Medicaid Bureau, Sally Richardson (hereinafter the "Richardson letter), telling States that:

> . . . at a minimum, each . . . must analyze its own payment system and any of its cost containment mechanisms (i.e., caps and *screens*) as it relates to covering the reasonable cost of providing FQHC and other ambulatory services. . . .a state must "determine[ ] and assure[ ] [CMS] that [the particular

---

[7] SF ¶¶ 6-7.

[8] See Exhibit A, JA 171 (lines 23-24).

[9] The Appeals Court's charge is to determine the productivity screen's provision of costs "under the Medicare statute." Wilson-Coker appeal at 139. To the extent Connecticut had legal responsibilities imposed by the statute or CMS requirement under the statute that it failed to fulfill in adopting the screen, the failure itself would render the screen invalid "under the Medicaid statute."

> cap(s) or screen(s)] covers the FQHC's reasonable cost for [all FQHC] services."

JA 92.

The Richardson letter is especially important because it implements what Congress, through legislative history, required for a reasonable cost determination. As explained in H.R. Rep. No. 247-101, at 392-93, *reprinted in* 1989 U.S.C.C.A.N. 2118-19 (emphasis added.), Congress' requirement for 100 percent reimbursement of reasonable costs was predicated on the fact that FQHCs not only are devoted to providing medical services to poor communities, and especially persons in those communities that have no means to pay for such services, but that every penny FQHCs do not receive from Medicaid reduces their ability to make services available to such truly needy individuals. Accordingly, whenever States take steps in their Medicaid programs that result in FQHCs receiving less for Medicaid services than the "reasonable costs" of furnishing those services, States effectively appropriate sums from other health center funding sources that otherwise would be used for free or charity care. The Report of the House Budget Committee accompanying H.R. 3299 (the House version of the 1989 OBRA) made this goal clear:

> To ensure that Federal PHS Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries, States would be required to make payment for these [ambulatory] services *at 100 percent of the costs* which are reasonable and related to the cost of furnishing these services . . .
>
> * * * *
>
> . . . The Subcommittee on Health and the Environment heard testimony that, on average, Medicaid payment levels to Federally funded health centers cover less than 70 percent of the costs incurred by the centers in serving Medicaid patients. The role of [health centers] ... is to deliver comprehensive

> primary care services to underserved populations or areas without regard to ability to pay. *To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is compromising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.*
>
> * * * *
>
> The Committee expects that, in determining reasonableness, the Secretary and *the States will use data on the actual costs incurred by health centers or programs in delivering ambulatory care.*

H.R. Rep. No. 247-101, at 392-93, *reprinted in* 1989 U.S.C.C.A.N. 2118-19 (emphasis added).[10]

Regarding Congress' intent behind its reasonable costs requirement and its expectation that a definition of reasonable costs would use actual costs of the FQHCs as a starting point, the Richardson letter, in connection with a State's use of a *Medicare* screen for its Medicaid program (the situation here), stated that:

> States have the flexibility to utilize the Medicare FQHC . . cost containment mechanisms (e.g. payment caps and *productivity screens*) as the basis for Medicaid payment as long as the State determines and assures [CMS] that [the mechanism] covers the *FQHC's* reasonable cost for [all FQHC] services.

---

[10] Congress' concern that one program should not wind up subsidizing another program is a concern that is commonly expressed in federal appropriations cases. As explained by the Comptroller General in *Principles of Federal Appropriations Law*, "Another way of stating the augmentation rule is that when Congress appropriates funds for an activity, the appropriation represents a limitation Congress has fixed for that activity, and all expenditures for that activity must come from that appropriation absent express authority to the contrary." *Principles of Appropriations Law*, Vol. II at 6-155. The prohibition against augmentation of appropriations has at its core the separation of powers doctrine, "[w]hen Congress makes an appropriation, it is telling the agency that it cannot operate beyond the level it can finance under its appropriation. To permit an agency to operate beyond this level with funds derived from some other source without specific congressional sanction would amount to a usurpation of the congressional prerogative." *Id.* at 6-103.

JA 93 (Emphasis added). This portion of the Richardson letter, because of its reference to a particular "FQHC's reasonable cost," incorporated Congress' expectation that a determination of reasonable costs would start with an FQHC's actual costs. For a State to conclude that despite a productivity screen all of a particular FQHC's reasonable costs were covered, as the Richardson letter necessitates, the State would have to use the FQHC's actual costs as its starting point, exactly what Congress wanted. Accordingly, to violate the Richardson letter in this respect is to fail to do what Congress insisted States must do in determining FQHC reasonable costs.

The Richardson letter also is highly important because of the fact that CMS did not entirely abandon the FQHC reasonable cost field when it decided not to issue FQHC Medicaid regulations. Rather, in deciding not to issue those regulations, it sent the Richardson letter to State Medicaid Directors advising them of what steps they had to take if they decided to define reasonable costs on their own. Thus, compliance with Ms. Richardson's letter became a pre-condition for States that decided to define reasonable costs. Put otherwise, the State's occupancy of the field of reasonable cost determinations could not be lawfully accomplished without following CMS's explicit instructions on how that occupancy was to be accomplished.

For the purposes of the Court's remand decision, Connecticut's failure to adopt a reasonable cost definition in the manner required by legislative history and CMS direction is all the Court needs to invalidate the productivity screen.

C. <u>CMS's Approval of Connecticut's Productivity Screen Gave That Screen No Legitimacy</u>

On the question of whether, in the absence of "Medicaid specific [FQHC] regulations", States may issue their own definitions of "reasonable and related" costs

(Wilson-Coker appeal at 137), the Second Circuit concluded its discussion by stating as follows:

> The plaintiff contends, however, that such an approach may permit States to undermine other important federal interests, such as the FQHC direct-grant program. That concern is misplaced. State determinations of "reasonable and related" costs must still be approved by CMS. *See* 42 U.S.C. §§ 1396; 1396a(b); 42 C.F.R. § 430.15(b). We presume that CMS will continue to safeguard the interests of the United States, even as it cultivates state-level innovation.

*Id.* at 139.

The Appeals Court's statutory and regulatory citations are noteworthy because they provide further direction on what the Appeals Court wanted to be considered on remand. Title 42 U.S.C. 1396 is the introductory provision to the Medicaid statute. Its relevance is its statement that federal Medicaid funds are made available only to States that "have submitted, and had approved by the Secretary, State plans for medical assistance." Section 1396a(b) then requires the Secretary (with very limited exception) to approve State plans that "fulfill[ ] the conditions specified" under the terms required by §1396a(a), which directly follows § 1396. Both references were (obviously) to the Medicaid statute's general requirement that States must have a specific plan approved by CMS to operate a Medicaid program.

It is actually the Appeals Court's regulatory reference, § 430.15(b), that makes clear where the basis of the Appeals Court's presumption "that CMS will . . . safeguard the interests of the United States" comes from and where it wants this Court to go. Section 430.15(b) refers specifically to the "Regional Administrator" of CMS, who, according to subsection (b), "exercises delegated authority to approve the state plan . . . on the basis of policy statements and precedents previously approved by the [CMS]

9

Administrator." Accordingly, the Appeals Court's question of the deference to be given CMS's State plan approvals must have been aimed at the review process conducted by CMS's regional offices, in this case, Boston.

As we know from prior proceedings, the Boston office's review process culminated in a CMS approval letter, dated June 21, 2001, to defendant Wilson-Coker from Margaret.A. Leoni, Chief, Medicaid Program Branch CMS Boston Region. JA 88-89. The record of what CMS's Boston office considered in reaching its decision (other than Connecticut's un-substantive and unhelpful (on the issue in this case) submissions) consists of deposition testimony of the CMS official who was responsible for CMS's review and written communications from CMS regarding the approval. We turn to that record

D.  The Regional Office's Review Does Not Legitimate the Productivity Screen

What CMS's Boston office did and did not do *vis-à-vis* Connecticut's productivity screen is largely reflected in the deposition of Richard C. Pecorella[11] who was the responsible official in that office for FQHC-related matters. According to him, in implementing the new PPS system for FQHC payments,

| | |
|---|---|
| Mr. Pecorella. | [t]he basic [principle] that CMS was operating on, was that the state will use the methodology it had in place in 1999 and 2000, which [are] the years you use to calculate your base year. You use whatever your methodology was then. That's what you use. They [referring to Connecticut] had the 4200 in there. That was their definition of reasonableness. |
| Mr. Feldesman. | Where did that premise come from? |
| Mr. Pecorella. | My central office. That was our guidance. |

---

[11] Mr. Pecorella was the regional official staff person assigned principal FQHC responsibility. His deposition transcript is filed as Exhibit B to the Statement of Material Facts Not in Dispute.

Tr. 20-21.

A later formal statement of the principle Mr. Pecorella described in his testimony was issued on September 12, 2001 (Exhibit C) -- a memorandum from CMS's Acting Director of its Families and Children's Health Programs Group to Associate Regional Administrators attaching "guidance in the form of Questions and Answers (Qs and As) on the new Medicaid PPS" program." Q and A 16 repeats Mr. Pecorella's principle.

> Question: The legislation states that the per visit rate shall be an amount that is equal to 100 percent of the average of the costs of the center/clinic of furnishing such services during fiscal year 1999 and fiscal year 2000 which are reasonable. What are the tests of reasonableness?
>
> Answer: The BIPA legislation requires the states to use tests of reasonableness in effect in fiscal year 1999 and fiscal year 2000 in establishing a PPS rate or, as prescribed in regulations under section 1833(a)(3) of the Social Security Act. This section of the statute allows for the application of caps and productivity screens.

Mr. Pecorella's official statement of that principle and why it resulted in the Boston office's approval of the productivity screen is contained in a letter he wrote for the head of the head of that office, Ronald Preston (letter at Exhibit A, JA 78-80). *See* Exhibit B at 35-36, 43, 48 for confirmation Mr. Pecorella wrote the letter. The Pecorella/Preston letter had been written as a response to concerns expressed to the Boston office by an association of Connecticut FQHCs over how Connecticut was implementing the FQHC PPS program. Regarding the principle, the letter stated that:

> While you are correct that the Bureau of Primary Health Care no longer uses productivity screens in the grant approval process, [DSS] is free to use these screens in establishing a Medicaid payment methodology. HCFA believes that Section 702 of BIPA requires [DSS] to use the methodology in place during fiscal years 1999 and 2000 in calculating the base year

11

> visit rate (January 1, 2001 to September 30, 2001). State statute 17b-245a requires [DSS] to use the Medicare productivity screens in establishing health center visit rates. This law has been in place since 1996. HCFA published the current Medicare screens in Section 503 of the Rural Health Clinic and Federally Qualified Health Center Manual (HCFA Pub. 27), effective in May 1997. Therefore, since 1997 [DSS], following its state law, has been using the screens in question. [DSS] had not updated its regulation nor the Medicaid State Plan to reflect the State statute cited above until the submission of the subject plan amendment.. Because state law supercedes [sic] state regulation, [DSS] correctly used the Medicare productivity screens. With the submission of this plan amendment, [DSS] has brought its regulation into agreement with State law and the State Plan into compliance with its practice.

Exhibit A, JA 78-80

If one pauses to think about it, the foregoing statement's conclusion is a preposterous proposition for a federal agency to advance. We say this because, as Mr. Pecorella conceded in his testimony, in implementing the productivity screen without first amending its State plan, Connecticut was violating the Medicaid statute:[12]

---

[12] Although a State's participation in the Medicaid program is voluntary, States must comply with the requirements imposed by the Medicaid Act and regulations promulgated by the Secretary of the Department of Health and Human Services ("HHS"). *Wilder v. West Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S. Ct. 2510, 2513, 110 L. Ed. 2d 455 (1990). In order to qualify for federal assistance under the Medicaid program, a State must submit to the Secretary and have approved a State plan describing the nature and scope of the State's Medicaid program. All provisions of a state plan must comply with federal statutes, regulations and official issuances of CMS. 42 C.F.R. § 430.10; see also Exhibit B, Pecorella Depo. at 25: 8-14; 28: 19-22.

As one Court has summarized, "'[i]n passing on the validity of a state Medicaid plan under federal law, the court must determine whether the plan is procedurally and substantively in compliance with the requirements of the Federal Medicaid Act and its implementing regulations.'" *De Luca v. Hammons*, 927 F. Supp. 132, 133 (S.D.N.Y. 1996), *quoting Amisub (PSL), Inc. v. Dep't of Social Servs.*, 879 F. 2d 789, 795 (10th Cir. 1989).

| | |
|---|---|
| Mr. Feldesman. | Now we go along and we're now at PPS, and the state wants to use 4200. Isn't there a requirement in the statute that state plan amendments have to be made, if a state is going to change, for example, a productivity screen number? |
| Mr. Pecorella. | Right |

Thus, the logic of the Boston office's interpretation of the central office's principle is that even if the way the State actually operated its FQHC program in 1999 and 2000 violated federal law or regulation, the principle required that office to approve the State's use of such an unlawful method for purposes of computing that State's FQHCs' PPS per visit rates.

Through this logic the Boston office avoided the obviously proper interpretation of the application principle to Connecticut: *i.e.* that the reasonable cost definition that was *legally* (not illegally) in place immediately prior to the PPS legislation must be utilized for the new PPS law. That same logic also allowed Boston to avoid consideration of whether the productivity screen had been properly implemented per the Richardson letter's requirements. Similarly, the logic permitted the Boston office to ignore the fact that the Richardson letter's required assurance that an FQHC's reasonable costs would be covered was never provided by the State. As further confirmation of the Boston office's avoidance of these responsibilities, we quote from Mr. Pecorella's testimony.

| | |
|---|---|
| Mr. Feldesman. | But the issue -- I guess what I'm trying to get at -- let me state what I guess I'm trying to get at, and see if you agree is that the substance of whether the 4200 number was reasonable was not considered. The real issue that you were wrestling with was the failure of the state to amend its plan and getting the state to amend its plan and bring itself into full compliance; is that a correct statement? |
| Mr. Pecorella. | That's a fair assessment of what went on. There was no question of reasonableness. There was a question of process, and the mistakes the state made. |

13

It is inconceivable that this *pas de deux* between CMS's Boston office and Connecticut to justify the State's adoption for PPS of what was *illegally* in effect should have been the result of the central office's principle. Surely, by its principle, CMS headquarters did not want regional approvals of standards that were unlawfully implemented or had been adopted without following the dictates of binding CMS requirements.

The irony in all this is that the logic of the May 21, 2001 Pecorella/Preston letter winds up explicitly contradicting the expectation of the Appeals Court that the regional office's approval would "safeguard the interests of the United States . . ." Wilson-Coker appeal at 139. When that letter states that [b]ecause state law supercedes [sic] state regulation, [Connecticut] correctly used the . . . productivity screen[ ]" (JA 79), it turns the Appeals Court's expectation on its head because it disregards the fact that the Boston office is responsible for enforcing *federal* Medicaid law and *federal* implementing requirements, not State law.

On any level, therefore, the Boston office's approval decision cannot be said to give legitimacy to the productivity screen. As a result, CMS's approval of the State plan amendment is entitled to no deference whatsoever.[13] The productivity screen lacks legal justification.

---

[13] Under the APA, agency action cannot be "arbitrary, capricious, an abuse of discretion, [ ] otherwise not in accordance with law", "unsupported by substantial evidence" as well as other requirements the Boston office's approval failed to meet. 5 U.S.C. § 706. This test requires that an agency decision contain a "rational connection between the facts found and the choice made," *Lozowski v. Mineta*, 292 F.3d 840, 845 (D.C. Cir. 2002), citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto, Ins. Co.*, 463 U.S. 29, 43 (1983) *("State Farm"); see also FCC v. Nextwave Personal Communications, Inc.*, 123 S.Ct. 832, 838 (2003) ("contrary to law" requirement of APA means *"any law"*).

October 26, 2005

                                      Respectfully submitted,

                                      Richard R. Brown
                                      Fed. Bar No. CT 00009
                                      Brown, Paindiris & Scott
                                      100 Pearl Street
                                      Hartford, CT 06103
                                      (860)522-3343(Telephone)
                                      (860)522-2490 (Facsimile)

                                      _____
                                      James L. Feldesman
                                      Kathy S. Ghiladi
                                      Feldesman Tucker Leifer Fidell LLP
                                      2001 L Street, N.W.
                                      Second Floor
                                      Washington, D.C. 20036
                                      Tel: (202) 466-8960
                                      Fax: (202) 293-8103

                                      Counsel for Plaintiffs

## CERTIFICATION

This is to certify that a copy of the foregoing Memorandum In Support of Plaintiffs' Motion for Summary Judgment was sent by federal express on October 26, 2005 to:

Lauren M. Nash
Assistant U.S. Attorney
P.O. Box 1824
New Haven, CT 06508

Thomas J. Ring
Assistant Attorney General
P.O. Box 120
Hartford, CT 06141-0120

Marilyn B. Fagelson, Esq.
Murtha Cullina LLP
2 Whitney Avenue
New Haven, CT 06510

Richard R. Brown
Brown, Paindiris & Scott
100 Pearl Street
Hartford, CT 06103

_____
James L. Feldesman