UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| COMMUNITY HEALTH CENTER, INC. | : | LEAD DOCKET NO. 3:01CV146(JBA) |
| *Plaintiff* | : | |
| | : | ALL CASES |
| v. | : | |
| | : | |
| PATRICIA WILSON-COKER, COMMISSIONER OF THE STATE OF CONNECTICUT DEPARTMENT OF SOCIAL SERVICES | : | |
| *Defendant* | : | November 14, 2005 |

**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

It is well established that the Secretary of Health and Human Services' interpretation of the federal Medicaid Act, as reflected in the approval of a state's Medicaid plan, is entitled to a high degree of deference. *Pharmaceutical Research and Manufacturers of America v. Thompson*, 362 F.3d 817, 822 (D.C. Cir. 2004) (Secretary's interpretations of Medicaid Act are entitled to *Chevron* deference); see generally, Defendant's Memorandum in Support of Motion for Summary Judgment, pp. 12-14. The Second Circuit has, in the context of the instant action, acknowledged that "[w]e take care not lightly to disrupt the informed judgments of those who must labor daily in the minefield of often arcane policy, especially given the substantive complexities of the Medicaid statute." *Community Health Center v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002).

Despite the general recognition that federal approval of a state Medicaid plan warrants judicial deference, the plaintiffs suggest that federal approval of the amended Connecticut state Medicaid plan in 2001 "is entitled to no deference whatsoever." In support of this radical departure from the normal principles of review pertaining to state Medicaid plans, the plaintiffs

posit two rather remarkable assertions in their brief: (1) that the state of Connecticut was required to demonstrate to CMS that CMS' own productivity screen is reasonable, and (2) that CMS approved the amended Connecticut state Medicaid plan in 2001 without regard to whether that plan was consistent with the Medicaid Act. These assertions are simply untenable. They rely on selected excerpts from testimony and documents that are taken out of context and they ignore long-standing legal principles.

**A. THE STATE OF CONNECTICUT WAS NOT REQUIRED TO DEMONSTRATE TO CMS THE REASONABLENESS OF CMS' OWN PRODUCTIVITY SCREEN**

The starting point in the plaintiffs' contention that CMS' approval of the amended Connecticut state Medicaid plan in 2001 is entitled to no deference is their argument that Connecticut failed to justify the productivity screen at issue to CMS and that such failure violated a specific CMS directive pertaining to FQHC Medicaid payment. This argument is based on the contents of a letter issued to state Medicaid Directors in 1995 by Sally Richardson, Director of the Medicaid Bureau within HCFA (now CMS). This letter, which predated the FQHC Prospective Payment System by five years, addressed FQHC Medicaid payment under the reimbursement system then in effect. The letter, by its terms, was issued for the purpose of "clarifying HCFA's policy regarding the use of upper payment limits for FQHC and other ambulatory services." JA 92 (Exhibit A to Plaintiffs' Statement of Material Facts Not in Dispute).

With regard to the Richardson letter, the defendant recognizes full well that "even relatively informal HCFA (now CMS) interpretations, such as letters from regional administrators, 'warrant[s] respectful consideration' due to the complexity of the statute and the considerable expertise of the administering agency." *Community Health Center v. Wilson-Coker*, 311 F.3d at 138 (Citations omitted). In terms of whether the amended Connecticut state

Medicaid plan is consistent with the Medicaid statute as amended in 2000, however, it is difficult to comprehend how a letter issued by the Director of the Medicaid Bureau in 1995 could trump the statutorily mandated CMS approval of the amended state plan in 2001.

With regard to state Medicaid plans and plan amendments, Congress expressly delegated authority to the Secretary of Health and Human Services to implement the provisions of the statutes governing those plans. That authority has been delegated by the Secretary to CMS. 42 C.F.R. §430.15 (b). CMS, in turn, has implemented a formal review and approval process concerning state Medicaid plans and plan amendments for the specific purpose of determining whether proposed plans or plan amendments are consistent with the Medicaid Act. As previously noted, courts have accorded the highest degree of deference to the Secretary's interpretation of the Medicaid Act as reflected in the approval of a state Medicaid plan. See generally, Defendant's Memorandum in Support of Motion for Summary Judgment, pp. 12-14. The 1995 Richardson letter obviously did not and could not address whether the Connecticut amended state Medicaid plan was consistent with a 2000 legislative enactment. With respect to that issue, it is readily apparent that CMS' approval of the amended state plan is entitled to a greater degree of deference than the 1995 Richardson letter.

Apart from the question of relative deference, the plaintiffs' reliance on the 1995 Richardson letter is misplaced in any case. The letter, considered in its entirety, does not support the novel contention that a state was required to demonstrate the reasonableness of a federal agency's standard to that very federal agency. Initially, the letter notes that "State agencies are free to establish and apply their own tests of efficiency and economy when paying FQHCs…." JA 92. With regard to states that establish "their own tests of efficiency and economy," the letter goes on to provide that "each State must analyze its payment system and any of its cost

3

containment mechanisms (i.e., caps and screens) as it relates to covering the reasonable cost of providing FQHC and other ambulatory services. Id.

Following its discussion of states using their own efficiency tests, the Richardson letter goes on to note that "States have the flexibility to utilize the Medicare FQHC payment system and its cost containment mechanisms (e.g., payment caps and productivity screens) as the basis for Medicaid payment, as long as the State determines and assures HCFA that it covers the FQHC's reasonable cost for both core and other ambulatory services." JA 93. Because FQHC services covered by Medicaid are broader than those covered under Medicare, the assurance sought by HCFA was that states utilizing Medicare cost containment mechanisms were covering "for both core and other ambulatory services." Id.  The nature of CMS' concern in this regard is expressed even more clearly in the succeeding paragraphs of the letter:

> Although we believe it is acceptable to adopt the Medicare FQHC payment system, we have one caution with respect to using the Medicare payment cap. The Medicare payment limit does not account for other ambulatory services which are specific to the Medicaid FQHC program. The Medicare per visit limit is based on the cost associated with a routine primary care physician office visit and a laboratory procedure (e.g., cholesterol screening)….Therefore, if your Medicaid agency plans to use the Medicare system exclusively, a determination would have to be made on whether adjustments to the Medicare payment limit are needed to account for the costs incurred in furnishing other ambulatory services.

Id.

The Medicaid statute itself recognizes that there is a difference between FQHC services covered under Medicare and those covered under Medicaid. In addressing the utilization of tests of reasonableness prescribed in Medicare regulations, the statute specifically provides for payment "in the case of services to which such [Medicare] regulations do not apply…." 42 U.S.C. § 1396a (bb)(2). See also Deposition Transcript of Richard Pecorella, pp. 10-11 (With respect to FQHCs, "Medicaid covers a lot more than [Medicare covered services].") (Mr.

4

Pecorella's deposition transcript is attached as Exhibit B to Plaintiffs' Statement of Material Facts Not in Dispute).

There is no logical basis upon which to conclude that CMS required or expected a state to demonstrate the reasonableness of a CMS Medicare productivity standard in order for the state to utilize that standard in its Medicaid system. The 1995 Richardson letter certainly does not establish such a requirement. This point is further illuminated by the deposition testimony of CMS officials in this case. Richard Pecorella, the CMS official in the Boston Regional Office who actually conducted the review of the Connecticut amended state Medicaid plan, testified as follows with regard to the 4200 visit physician productivity standard:

> A   To question what they were doing, not to mention that if this particular standard screen, whatever you want to call it, was essentially being imposed on Medicare payment to Federally Qualified Health Centers, there is a basic assumption that it's reasonable.
>
> Q   By you?
>
> A   By me, because I'm not questioning my agency. I mean, I would have to say that my agency is wrong before I said to the state that they're wrong.

Tr., pp. 22-23. Mr. Pecorella also testified that with regard to the 4200 visit productivity screen, "[t]here was no question of reasonableness." Mr. Pecorella, who has been the regional contact for FQHCs since 1990 and is familiar with CMS policies and manuals concerning FQHCs; Tr., pp. 7-8; clearly did not require or expect Connecticut to demonstrate the reasonableness of CMS' productivity standard in order to include that standard in its amended state Medicaid plan. There is no merit to the plaintiffs' contention that Connecticut failed to satisfy a CMS requirement that the state demonstrate to CMS the reasonableness of CMS' own productivity standard.

**B. THE PLAINTIFFS HAVE FAILED TO OVERCOME THE PRESUMPTION OF REGULARITY THAT ATTACHED TO CMS' APPROVAL OF THE CONNECTICUT AMENDED STATE MEDICAID PLAN**

The second pillar upon which the plaintiffs rest their claim that CMS' approval of the Connecticut amended state Medicaid plan is entitled to "no deference whatsoever" is the alleged abdication by CMS of its statutory mandate to determine that a proposed amendment to a state Medicaid plan is consistent with the Medicaid Act. That assertion is equally unavailing to the plaintiffs' cause. The plaintiff constructs its argument largely on the basis of statements made by Richard Pecorella at his deposition. These statements, taken out of context, fail to present the complete picture of Mr. Pecorella's testimony and they fall far short of the clear and strong evidence needed to overcome the presumption of regularity attaching to CMS' approval of the Connecticut amended state Medicaid plan.

It is beyond question that "a presumption of regularity attaches to the actions of government agencies." *United States Postal Service v. Gregory*, 534 U.S. 1, 10 (2001). See also *Asco-Falcon II Shipping Company v. The United States*, 32 Fed.Cl. 595, 604 (1994) ("[I]t is well-settled that government officials are presumed to act conscientiously and in good faith in the discharge of their duties."). That strong presumption cannot be overcome "in the absence of clear evidence to the contrary…." *Miley v. Principi*, 366 F.3d 1343, 1347 (Fed.Cir. 2004); see also *J. Cooper & Associates v. United States*, 53 Fed.Cl. 8, 53 (2002) ("The burden to overcome the presumption that a government official acted properly and in good faith is substantial…."); *McIntyre-Handy v. West Telemarketing Corp.*, 97 F.Supp.2d 718, 727 (E.D.Va. 2000) ("[I]n the absence of clear evidence to the contrary, courts presume that they [public officers] have properly discharged their official duties."). The out of context testimony cited by the plaintiffs

does not come close to the type of clear evidence necessary to overcome the presumption of regularity attaching to the approval of the Connecticut amended state Medicaid plan.

Since the plaintiffs' argument relies so heavily on the deposition testimony of Richard Pecorella, it is worthwhile to undertake a careful, comprehensive review of that testimony. Mr. Pecorella, who has been with the regional office for twenty-four years, has been the regional contact person within CMS' Boston Office "since FQHC came into the law." Tr., pp.5- 8. His training relative to his position as regional FQHC contact is mostly experience, which includes "learn[ing] and study[ing] the law, the regs., any policy, manuals, whatever this agency will officially put out. And then you have the experience of dealing with state officials, who are working the program." Tr., p. 7. In his capacity as regional FQHC contact, Mr. Pecorella is the person who reviews and makes recommendations about any state plan material pertaining to FQHCs. Tr., p. 6.

At the time he reviewed the 2001 Connecticut amended state Medicaid plan, Mr. Pecorella was aware of that Community Health Center, Inc. had filed a lawsuit challenging the use by the State of Connecticut of the Medicare 4200 visit physician productivity standard in connection with establishing Medicaid rates for FQHCs. Tr., pp. 16-20. After his initial review of the amended state Medicaid plan proposed by Connecticut, Mr. Pecorella "got them [the State of Connecticut] to correct, fix" certain issues. Tr., p. 17. These issues included concerns that had been brought to Mr. Pecorella's attention by representatives of the FQHCs. Tr., p.19.

Mr. Pecorella had one or more discussions with state officials specifically about the 4200 visit productivity standard that was being challenged at that time by Community Health Center, including the claim that there was no longer any reason to use the 4200 visit standard, since HRSA no longer uses it. Tr., p. 19-20. Mr. Pecorella's response to that claim was that it

7

"wasn't particularly germane, because their [sic] regulation was saying we're using what Medicare had in its manual, and this is in the Medicare manual." Tr., p. 20.

It is true that Mr. Pecorella went on to state that "the basic principle that CMS was operating on, was the state will use the methodology it had in place in '99 and 2000, which is the years you use to calculate your base." To suggest, however, that Mr. Pecorella considered only whether the amended state plan reflected the 1999 and 2000 methodology, without any regard as to whether the amended state plan was consistent with the Medicaid Act, is to do a disservice to Mr. Pecorella and to distort his testimony. Such a suggestion is also inconsistent with the principle that "[t]he presumption [of the regularity of official action] is sufficient to 'sustain the inference' that an agency did 'whatever was appropriate' to effectuate an instituted procedure." *McIntyre-Handy v. West Telemarketing Corp.*, supra at 727-728 (Citations omitted). Plaintiffs' counsel questioned Mr. Pecorella further about the "basic principle" of using the 1999 and 2000 methodology and asked, with respect to what was in place prior to the enactment of the Prospective Payment System legislation, "What if the system the state had was unlawful?" Mr. Pecorella answered that question by stating "[b]ut I don't think it was." Tr., 21.

With respect to the 4200 visit productivity standard, Mr. Pecorella's statements about using what was in place for 1999 and 2000 for the purpose of determining the 2001 base must be considered in the overall context of his testimony. At the time he reviewed the Connecticut amended state Medicaid plan, he was aware that this issue had been raised by Community Health Center and had discussed this issue with officials from the State of Connecticut. In further response to questioning by plaintiffs' counsel about the utilization of the 1999 and 2000 methodology, Mr. Pecorella testified with regard to the 4200 visit standard that there was "a basic assumption that it's reasonable," since it was being used in connection with Medicare

8

FQHC payments, and for that reason "I would have to say that my agency is wrong before I said to the state that they're wrong." Tr., pp. 22-23. He further testified that as to the 4200 visit standard, "[t]here was no question of reasonableness." Tr., p. 39.

When asked directly why he had approved the Connecticut amended state Medicaid plan, knowing that it contained the 4200 visit standard, Mr. Pecorella testified that there were two reasons: (1) "[i]t's in the Medicaid [sic] manual," and (2) "the basic premise we're operating on with PPS was for the two base years you will do the methodology that was in place." Tr., pp. 34-35. This testimony clearly demonstrates that Mr. Pecorella did not review the 2001 Connecticut amended state Medicaid with blinders on, focusing only on whether the amended plan used the methodology in place for 1999 and 2000. Mr. Pecorella obviously was aware of and discussed the 4200 visit standard issue and concluded that, since it was a standard adopted by CMS for FQHC Medicare payment, "there was no question of reasonableness" as to the inclusion of that standard in the Connecticut plan.

That Mr. Pecorella reviewed the proposed Connecticut amended state Medicaid plan with an eye toward its consistency with the Medicaid Act is further demonstrated by his testimony that he succeeded in having the state make changes in its proposed plan that he believed were required by the federal statute:

> A     They needed to have language in their regulation that said that health centers would have some ability to request a reconsideration, some sort of ability to have whatever rates were set to be reconsidered based on special circumstances. The state put that in.
>
> Q     At your request?
>
> A     Right. I think that's clear, just in our statute.

Tr., p. 17. The steps taken by Mr. Pecorella to work with state officials to achieve consistency with the Medicaid Act reflect the presumption expressed by the Second Circuit that "CMS will

9

continue to safeguard the interests of the United States, even as it cultivates state-level innovation." *Community Health Center v. Wilson-Coker*, 311 F.3d at 139.

The plaintiffs also seem to suggest in their brief that CMS should have determined that Connecticut was "out of compliance" with the requirements Medicaid, and, on that basis, not approve the Connecticut amended state Medicaid plan, because Connecticut had not amended its state plan prior to 2001 to reflect the utilization of the 4200 visit Medicare productivity standard by Connecticut since 1996 pursuant to Conn. Gen. Stat. § 17b-245a. As noted by the Second Circuit, "although certain portions of the Amended Complaint appear to challenge CMS's decision to approve the Plan…CHC did not name CMS as a defendant, and CMS is not a party to this litigation." *Community Health Center v. Wilson-Coker*, 311 F.3d at 135 n. 5. From the time Connecticut implemented the 4200 visit standard in 1996 until the time it amended its state plan in 2001, not a single Connecticut FQHC voiced a complaint with the CMS regional FQHC contact, Mr. Pecorella, that the state was out of compliance with the Medicaid Act. Deposition Transcript of Richard Pecorella, p. 33.[1]

In addition to the failure of the plaintiffs to directly challenge CMS' approval of the Connecticut amended state Medicaid plan, or name CMS as a defendant in this action, it is clear from the deposition of CMS officials in this case that there is a process by which a state may be determined to be non-compliant with the Medicaid Act and that such a determination is not automatic. Rhonda Rhodes, a Director within the Center for Medicaid State Operations of CMS, testified that if there were a question as to whether a state was out of compliance as a result of

---

[1] It is also noteworthy in this regard that in connection with the formulation of the CMS Questions and Answers on the Medicaid PPS FQHC reimbursement requirements, which the plaintiffs attached as Exhibit C to their Statement of Material Facts Not in Dispute, no one CMS consulted with, including the National Association of Community Health Centers, took issue

implementing a change to its Medicaid program before it amended its state plan, "[w]e would do an investigation. It's not a given that they are automatically out of compliance.". Exhibit A, Deposition Transcript of Rhonda Rhodes, pp. 4, 57.  Ms. Rhodes went on to state that even if it were assumed that a state was out of compliance by implementing a program change before amending its state plan, any directive to the state from CMS resulting from that circumstance would be determined "on a case by case basis" and would depend on "[t]he facts of the matter at hand." Id at 57-58.

With specific reference to the implementation by Connecticut of the 4200 visit productivity standard, there was never a determination by CMS, at either a regional or national level, of noncompliance on the part of the State of Connecticut. Deposition Transcript of Richard Pecorella, pp. 44-45. CMS did determine, however, that the 2001 Connecticut amended state Medicaid plan, once it was revised to address concerns that Mr. Pecorella had raised with state officials, complied with the Medicaid Act. Tr. pp. 17-19, 35-36. Once again, the plaintiffs' efforts do not come close to rebutting the presumption that CMS acted conscientiously and in good faith in approving the Connecticut amended state Medicaid plan. Consequently, the plaintiffs cannot succeed in their contention that the CMS approval of that plan is entitled to "not deference whatsoever."

## CONCLUSION

For all the reasons stated above, as well as those contained in the Defendant's Memorandum in Support of Motion for Summary Judgment, the plaintiffs' claim that the CMS approval of the Connecticut amended state Medicaid plan is entitled to "no deference

---

with the continued use of productivity screens under the Prospective Payment System. Exhibit A, Deposition Transcript of Rhonda Rhodes, pp. 44-45.

whatsoever" should be rejected and the plaintiffs' Motion for Summary Judgment should be denied.

                                DEFENDANT
                                PATRICIA WILSON-COKER,
                                COMMISSIONER OF THE STATE OF
                                CONNECTICUT DEPARTMENT OF
                                SOCIAL SERVICES

                                RICHARD BLUMENTHAL
                                ATTORNEY GENERAL

                                Richard J. Lynch
                                Assistant Attorney General


BY:   /s/_____
        Thomas J. Ring
        Assistant Attorney General
        Federal Bar No. ct08293
        55 Elm Street
        P.O. Box 120
        Hartford, CT  06141-0120
        Tel: (860) 808-5210
        Fax: (860) 808-5385
        Thomas.Ring@po.state.ct.us

## CERTIFICATION

I hereby certify that a copy of the foregoing Opposition to Plaintiffs' Motion for Summary Judgment was mailed in accordance with Rule 5(b) of the Federal Rules of Civil Procedure on this 14th day of November, 2005 to:


Attorney Richard R. Brown
Brown, Paindiris & Scott
100 Pearl Street
Hartford, CT 06103

Attorney James L. Feldesman
Feldesman, Tucker, Leifer, Eidell and Bank
2001 L Street, N.W.
Washington, D.C. 20036

Lauren M. Nash, Assistant United States Attorney
P.O. Box 1824
New Haven, CT 06508

Attorney Marilyn Fagelson
Murtha Cullina LLP
2 Whitney Avenue
P.O. Box 704
New Haven, CT 065030-0704

/s/_____
Thomas J. Ring
Assistant Attorney General

2