UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

COMMUNITY HEALTH CENTER, INC., *et al.*     )
                                             )
        Plaintiffs,                         )
                                             )
v.                                           ) Lead Docket No.
                                             ) Civil Action No. 301cv146(JBA)
PATRICIA WILSON-COKER, J.D., M.S.W.,         )
COMMISSIONER OF THE                          )
STATE OF CONNECTICUT                         )
DEPARTMENT OF SOCIAL SERVICES,               )
                                             )
        Defendant.                          )
_____)

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Despite defendant's insistence to the contrary, as we pointed out in our summary judgment motion, the Appeals Court's specific remand instructions leave no room for this Court to engage in so-called phase two before it reaches its conclusion. Those instructions were:

> Therefore, on remand, the district court must consider anew what role CMS's[1] approval of the Connecticut State Plan should play in assessing the reasonableness of the 4,200 productivity screen. That the district court did not grant CMS's approval any deference, *Cmty. Health Ctr.*, 175 F.Supp.2d at 348, is not relevant to the district court proceedings on remand, because that decision was premised on an interpretation of § 1396a(bb) that we have now reversed. The district court therefore should consider whether to defer to the implicit judgment of the Secretary that a state plan

---

[1] CMS refers to the Centers for Medicare and Medicaid Services, the new name for the Health Care Financing Administration (HCFA"). CMS administers the Medicaid program within the Department of Health and Human Services ("HHS")

1

> complies with federal law. *See Concourse Rehab. & Nursing Ctr. Inc. v. Whalen*, 249 F.3d 136, 145 (2d Cir.2001) (citing *Perry v. Dowling*, 95 F.3d 231, 236-37 (2d Cir. 1996); *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1313 (2d Cir. 1991). In making this determination, the district court should bear in mind the principles of deference that we have outlined above. Deference, however, even at its highest levels, is not a "rubber stamp[ ]." *Pinnacle Nursing Home*, 928 F.2d at 1314. In assessing the reasonableness of CMS's decision, the district court may consider the materials submitted by Connecticut in support of its plan, and the factors considered by CMS in evaluating those materials.

*Community Health Center v. Wilson-Coker*, 311 F. 3d 132, 139 (2nd Cir. 2002) ("Wilson-Coker Appeal") (footnote omitted).

The foregoing language was aimed at a determination of "whether [the] productivity screen passes statutory muster on its own terms." Wilson-Coker appeal at 139. If the 4200 physician visit productivity screen fails to pass "statutory muster" as we assert, there should be no need to proceed any further - - the screen cannot and should not be applied in calculating plaintiffs' reimbursement under the Medicaid program. Nothing in a "phase two" inquiry, as defendant has posited such inquiry, would serve to legitimate a screen that fails to pass statutory muster.

## II. BASES FOR OPPOSITION

### A. HHS' Approval of the Connecticut State Plan Warrants No Deference from this Court

Defendant argues (at 11-14) that CMS' approval of the Connecticut State Plan Amendment containing the 4200 productivity guideline for physicians is entitled to deference under the principles of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782, 81 L. Ed. 2d 694 (1984) ("*Chevron*"). For the reasons set forth below, the *Chevron* framework is not applicable to

2

the circumstances surrounding HHS' approval of the Connecticut State Plan Amendment containing the 4200 physician productivity guideline. What governs this Court's analysis of the action taken by CMS is the Administrative Procedure Act ("APA"), pursuant to which agency action cannot be "arbitrary, capricious, an abuse of discretion, [] otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706; *see also Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto Ins., Co.*, 463 U.S. 29, 50 (1983), *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

> 1. **The *Chevron* Framework is Inapplicable to the Circumstances Surrounding HHS' Approval of Connecticut's State Plan Amendment**

*Chevron* and its progeny address situations in which the provisions of a statute are unclear or ambiguous. It is well settled that *Chevron* deference comes into play only when a "court determines that Congress has not directly addressed the precise question at issue." *Chevron*, 467 U.S. 837 at 843 (footnote omitted). In such a situation, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* The principles of *Chevron*, therefore, are tools used by Courts in interpreting the law.[2]

What actually happened here begins with legislative history previously cited in our memorandum in support of summary judgment, which bears repeating here:

> To ensure that Federal PHS Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries, States would be required to make payment for these [ambulatory] services *at 100 percent of the costs* which

---

[2] According to the Second Circuit: "[t]hese principles [of deference] are generally applicable to interpretations of federal statutes by federal agencies." *Perry v. Dowling*, 95 F. 3d 231, 236 (2nd Cir. 1996).

> are reasonable and related to the cost of furnishing these services . . .
>
> \* \* \* \*
>
> . . . The Subcommittee on Health and the Environment heard testimony that, on average, Medicaid payment levels to Federally funded health centers cover less than 70 percent of the costs incurred by the centers in serving Medicaid patients. The role of [health centers] ... is to deliver comprehensive primary care services to underserved populations or areas without regard to ability to pay. *To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is compromising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.*
>
> \* \* \* \*
>
> The Committee expects that, in determining reasonableness, the Secretary and *the States will use data on the actual costs incurred by health centers or programs in delivering ambulatory care.*

H.R. Rep. No. 247-101, at 392-93, *reprinted in* 1989 U.S.C.C.A.N. 2118-19 (emphasis added).

Accordingly, to make reasonableness determinations, Congress wanted the Secretary of HHS *and* the States to use data on the "actual costs" incurred by the health centers. In fact, neither CMS' decision to approve the State Plan Amendment nor the State's decision to adopt the productivity screen considered actual costs (among other failings). CMS did not "interpret" a statute when it allowed Connecticut to use the 4200 productivity screen contained in the Connecticut State Plan amendment, nor did it follow Congress' intent in doing so.[3]

---

[3] As the *Chevron* Court opined, "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. 837 at 842-43.

4

2. **CMS' Approval of the Connecticut State Plan Was Arbitrary and Capricious and Failed to Note That Defendant Did Not Comply With the Requirements of the Richardson Letter**

The discovery of CMS officials taken in this case at the central and regional offices shows that CMS acted arbitrarily and capriciously in approving[4] Connecticut's State Plan Amendment. Before we turn to that discovery, a brief history of Connecticut's adoption and use of the 4200 productivity screen may be helpful.

a. **History of the 4200 Screen**

The productivity screen at issue was the product of a State 1996 legislative enactment. Wilson-Coker appeal at 134. It was put into use by DSS for Connecticut's Medicaid program once that State law was passed. In so doing, DSS neglected to amend Connecticut's State Medicaid plan to incorporate the screen. Only after this case was filed, five years after the 1996 enactment, was that amendment made. Until then, Connecticut's State Plan included a productivity screen of 3400 visits. That previous State Plan underwent review and had received HCFA approval. Plaintiffs' SF ¶ 3.[5]

b. **The Richardson Letter**

Defendant provided CMS with no justification for the 4200 screen or assurance that the screen did not affect coverage of an FQHC's reasonable costs. Plaintiffs' SF ¶6.

---

[4] It may be helpful to reiterate here that the reason why the Second Circuit has directed us to focus on CMS' approval of the State Plan Amendment is because in seeking CMS' approval of the State plan amendment, DSS provided no justification for the screen or assurance that the screen did not affect coverage of an FQHC's reasonable costs as the Richardson letter, discussed below, requires. Indeed, defendant's entire case for the screen's underlying legitimacy has rested on CMS' adoption of that screen for the FQHC Medicare program.

[5] References to the accompanying Plaintiffs' Statement of Material Facts as to which there is no genuine dispute in support of their summary judgment motion shall be as follows: SF ¶ __.

In promulgating and applying the screen, defendant ignored the requirements of the May 8, 1995 Richardson letter which directed the States as follows:

> . . . at a minimum, each . . . must analyze its own payment system and any of its cost containment mechanisms (i.e., caps and *screens*) as it relates to covering the reasonable cost of providing FQHC and other ambulatory services. . . .a state must "determine[ ] and assure[ ] [CMS] that [the particular cap(s) or screen(s)] covers the FQHC's reasonable cost for [all FQHC] services."

Plaintiffs' Exhibit A at JA 92. As to a State's use of a Medicare screen for its Medicaid program, the Richardson letter stated that:

> States have the flexibility to utilize the Medicare FQHC . . cost containment mechanisms (e.g. payment caps and *productivity screens*) as the basis for Medicaid payment as long as the State determines and assures [CMS] that [the mechanism] covers the *FQHC's* reasonable cost for [all FQHC] services.

JA 93 (Emphasis added). This portion of the Richardson letter, because of its reference to a particular "FQHC's reasonable cost," (whether by design or accident) incorporated Congress' expectation that a determination of reasonable costs would start with an FQHC's actual costs. Defendant never made such a determination.

Richard Pecorella was the CMS regional office (Boston) staff person assigned principal FQHC responsibility. Plaintiffs' SF ¶ 9. According to Mr. Pecorella, in implementing the new PPS system for FQHC payments, his office received the following guidance from the CMS central office:

> Mr. Pecorella: [t]he basic [principle] that CMS was operating on, was that the state will use the methodology it had in place in 1999 and 2000, which [are] the years you use to calculate your base year. You use whatever your methodology was then. That's what you use. They [referring to Connecticut] had the 4200 in there. That was their definition of reasonableness.

6

Plaintiffs' SF ¶ 10.

In September 2001, shortly after the Boston region approved Connecticut's plan, CMS's Acting Director of its Families and Children's Health Programs Group issued a memorandum to Associate Regional Administrators attaching "guidance in the form of Questions and Answers (Qs and As) on the new Medicaid PPS" program." Q and A 16 provides that:

> Question: The legislation states that the per visit rate shall be an amount that is equal to 100 percent of the average of the costs of the center/clinic of furnishing such services during fiscal year 1999 and fiscal year 2000 which are reasonable. What are the tests of reasonableness?
>
> Answer: The BIPA legislation requires the states to use tests of reasonableness in effect in fiscal year 1999 and fiscal year 2000 in establishing a PPS rate or, as prescribed in regulations under section 1833(a)(3) of the Social Security Act. This section of the statute allows for the application of caps and productivity screens.

Plaintiffs' SF ¶ 11. Mr. Pecorella's official statement of that principle and why it resulted in the Boston office's approval of Connecticut's productivity screen is contained in a letter he wrote for the head of the head of that office, Ronald Preston. Plaintiffs' SF ¶ 12. The letter stated that:

> While you are correct that the Bureau of Primary Health Care no longer uses productivity screens in the grant approval process, [DSS] is free to use these screens in establishing a Medicaid payment methodology. HCFA believes that Section 702 of BIPA requires [DSS] to use the methodology in place during fiscal years 1999 and 2000 in

7

>calculating the base year visit rate (January 1, 2001 to September 30, 2001). State statute 17b-245a requires [DSS] to use the Medicare productivity screens in establishing health center visit rates. This law has been in place since 1996. HCFA published the current Medicare screens in Section 503 of the Rural Health Clinic and Federally Qualified Health Center Manual (HCFA Pub. 27), effective in May 1997. Therefore, since 1997 [DSS], following its state law, has been using the screens in question. [DSS] had not updated its regulation nor the Medicaid State Plan to reflect the State statute cited above until the submission of the subject plan amendment. Because state law supercedes [sic] state regulation, [DSS] correctly used the Medicare productivity screens. With the submission of this plan amendment, [DSS] has brought its regulation into agreement with State law and the State Plan into compliance with its practice.

Plaintiffs' SF ¶13, Plaintiffs' Exhibit A, JA 78-80.

Of the many things wrong with the Preston letter, two stand out. The first is its assertion that DSS "correctly used the Medicare productivity screen." As this Court well knows, State law gives way to federal law and regulation governing a federal grant a State has voluntarily accepted. Under federal regulation, as conceded by Mr. Pecorella in his deposition ((at 25-30), States must comply with their State plans until those plans are properly amended (which involves State process and Regional Office approval).

The second is the logic of the Boston office's interpretation of the central office's principle: that even if the way the State actually operated its FQHC program in 1999 and 2000 violated federal law or regulation, the regional office would be required to approve the State's use of that unlawful method for purposes of computing that State's FQHCs' PPS per visit rates (to begin on January 1, 2001). Presumably, if DSS had previously

8

been reimbursing only half of all legitimate costs incurred because its State law required it to, the Regional Office would have approved that as well.

In reviewing and issuing its approval of Connecticut's State Plan Amendment, Mr. Pecorella testified that CMS was concerned only with ensuring that the State's payment methodology was in compliance with the terms of the State plan amendment. Plaintiffs' SF ¶14. No consideration was given to the fact that the prior State Plan which had already been approved contained a screen of 3400 visits, nor was there consideration by the Boston region of the issue of reasonableness of the 4200 screen itself. *Id.* No one at CMS took note of the fact that defendant failed to perform any sort of analysis, let alone one that examined a health center's actual costs, or that defendant failed to provide the assurance required by the Richardson letter.

In so approving the State plan amendment containing the 4200 screen and ignoring defendant's failure to comply with the Richardson letter, the Regional Office acted arbitrarily, capriciously and unlawfully. The Richardson letter and the directive of Congress contained in the House Report cited above required the State (or CMS) to consider each FQHC's actual costs. The letter additionally required sufficient analysis to generate an assurance that the productivity screen would not cut into any FQHCs reasonable costs. HHS is bound by and to enforce its own rules. *See e.g,. United States v. Shaughnessy,* 347 U.S. 260 (1954); *Arizona Grocery Co. v. Topeka & Santa Fe Railway,* 284 U.S. 370 (1932); *Vietnam Veterans of America v. Secretary of Navy,* 843 F.2d 528, 537 (D.C. Cir. 1988). "[A]n agency issuing a . . . rule is itself bound by the rule until that rule is amended or revoked. *See United States v. Nixon,* 418 U.S. 683, 695-96 (1974); *United States ex rel. Bilokumsky v. Tod* 263 U.S. 149, 151 . . ." *National*

*Family Planning and Reproductive Health Association v. Sullivan*, 979 F.2 227, 234 (D.C. Cir. 1992) (parallel Supreme Court citations, treatise reference and quotation omitted). Significantly, there is Second Circuit case law to the same effect; *i.e.* that the Richardson letter and the standards it expressed bound both CMS and the State under *Hansen v. Harris*, 619 F. 2d 942, 948 (2nd Cir. 1980)(concluding that Social Security Claim Manual bound Government conduct).

Defendant argues (at 15-18) that the Secretary's interpretation is not manifestly contrary to statute. But, as seen above, CMS regional officials' only interpretative action with respect to Connecticut's State Plan Amendment was to view a set of Qs and As as eliminating all other legal requirements. The logic employed by the Boston office that it was required to approve the use of a State's unlawful conduct as long as that conduct was being employed prior to January 1, 2001 is hardly something to which this Court should give deference.

It is well established that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto Ins., Co.*, 463 U.S. 29, 50 (1983) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Under the Administrative Procedure Act, agency action cannot be "arbitrary, capricious, an abuse of discretion, [] otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706. This test requires that an agency decision contain a "rational connection between the facts found and the choice made." *Lozowski v. Mineta*, 292 F.3d 840, 845 (D.C. Cir. 2002), citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also FCC v. Nextwave Personal Communications, Inc.*, 123 S. Ct. 832, 838 (2003)("contrary to law"

requirement of APA means "*any* law"). Mr. Pecorella's testimony about the logic he and his office utilized is the only explanation offered by his agency as to why it approved Connecticut's State Plan Amendment. As such, the approval is arbitrary, capricious and unlawful.

### III. CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that Defendant's Motion for Summary Judgment be denied and plaintiffs' summary judgment motion be granted.

November 15, 2005

Respectfully submitted,

Richard R. Brown
Fed. Bar No. CT 00009
Brown, Paindiris & Scott
100 Pearl Street
Hartford, CT 06103
(860)522-3343 (Telephone)
(860)522-2490 (Facsimile)

_____
James L. Feldesman
Kathy S. Ghiladi
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W.
Second Floor
Washington, D.C. 20036
Tel: (202) 466-8960
Fax: (202) 293-8103

Counsel for Plaintiffs

## **CERTIFICATION**

This is to certify that a copy of the foregoing was sent by Federal Express overnight mail on November 14, 2005 to:

Lauren M. Nash
Assistant U.S. Attorney
P.O. Box 1824
New Haven, CT 06508

Thomas J. Ring
Assistant Attorney General
P.O. Box 120
Hartford, CT 06141-0120

Marilyn B. Fagelson, Esq.
Murtha Cullina LLP
2 Whitney Avenue
New Haven, CT 06510

Richard R. Brown
Brown, Paindiris & Scott
100 Pearl Street
Hartford, CT 06103

_____
James L. Feldesman